2 A.3d 344

TALBOT COUNTY, Maryland, et al.

v.

MILES POINT PROPERTY, LLC, et al.

Talbot County Council, et al.

v.

Shore Lands, LLC.

No. 79, Sept. Term, 2009.

Court of Appeals of Maryland.

July 26, 2010.

Reconsideration Denied Sept. 16, 2010.

374

Michael L. Pullen, Talbot County Atty. (Talbot County, Maryland Office of Law of Easton, MD), on brief, for appellants/cross-appellees.

Sharon Vanemburgh of Ewing (Stephen H. Kehoe of Ewing, Dietz, Fountain & Kehoe, P.A. of Easton, MD), on brief, for appellants/cross-appellees.

Demetrios G. Kaouris (Richard A. DeTar of Miles & Stockbridge, P.C. of Easton, MD), on brief, for appellees/cross-appellants.

Mark F. Gabler (Rich and Henderson, P.C. of Easton, MD), on brief, for appellees/cross-appellants.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

ADKINS, J.

Petitioner Talbot County (the "County") appeals from two judgments of the Circuit Court for Talbot County regarding the jurisdiction of the Talbot County Board of Appeals (the "Board").[1] Respondents Miles Point Property, LLC ("Miles Point") and Shore Lands, LLC ("Shore Lands") had submitted applications to the Talbot County Council (the "Council") to reclassify properties within the County for the purposes of the Talbot County Comprehensive Water and Sewer Plan. The

---

1. The two cases were consolidated for appeal at the request of Talbot County.

Council denied reclassification in both instances. Miles Point filed an appeal of the Council's decision with the Board, which found that it lacked jurisdiction to hear the appeal. The Circuit Court, on judicial review, reversed the Board's decision, and remanded the case for the Board to hear Miles Point's appeal.

In a separate and subsequent case, Shore Lands filed suit in the Circuit Court, seeking a writ of administrative mandamus compelling the Council to reclassify Shore Lands's property. Shore Lands was opposed by Respondent the Town of Easton ("Easton"), within whose borders the Shore Lands property is located. The Circuit Court, relying on the Miles Point case, found that Shore Lands was required to pursue an appeal first with the Board of Appeals before recourse may be had to judicial review, and dismissed the case.

Talbot County appealed both of these judgments to the Court of Special Appeals. On our own initiative, we granted certiorari[2] in the consolidated case in the Court of Special Appeals to consider the following issues:[3]

1. Did the Board of Appeals correctly decide it had no jurisdiction under the Express Powers Act, Article 25A, Section 5(U), to review the County Council's vote declining to approve the proposed amendments to the County Comprehensive Water and Sewer Plan?

2. Did the Board of Appeals correctly decide it had no jurisdiction under Talbot County Charter Section 502(4) because the County Council's action was not an executive, administrative or adjudicatory order, the Council's action was a legislative act, and because of the prohibition in Maryland Constitution Article XI-A, Section 2, prohibiting county charters from enlarging or expanding express powers granted by the General Assembly?

---

**2.** We granted certiorari before argument in the Court of Special Appeals pursuant to Md.Code (1973, 2006 Repl.Vol.), § 12–203 of the Courts and Judicial Proceedings Article.

**3.** *See Talbot County v. Miles Point; Talbot County v. Shore Lands,* 409 Md. 413, 975 A.2d 875 (2009) (granting certiorari).

3. Is the correct method for review of the County Council's action to invoke the original jurisdiction of the lower court and not to file an administrative appeal to the Board of Appeals?

We shall hold that the Board of Appeals was correct in deciding that, under the Express Powers Act, it had no jurisdiction over an appeal from the Council's action. We shall further hold that the proper vehicle for review of the Council's action is to invoke the original jurisdiction of the Circuit Court for Talbot County, but that mandamus does not lie in this case.

## FACTS & LEGAL PROCEEDINGS

This consolidated case involves two parcels of land located in Talbot County. We will review the facts relating to each parcel separately, as well as background facts relating to Talbot County's infrastructure.

### *Talbot County Infrastructure*

The following facts serve as a backdrop for the specific party interests in this case. Talbot County owns the Region II Wastewater Treatment Plant (the "Plant"), which serves a number of towns within the County. The Plant was operated, at all times relevant to this case, by an independent contractor under contract with the Talbot County Sanitary District. The Plant is funded through user fees paid by property owners served by the Plant, and through fees paid by other owners who are not served by the Plant, but pay "benefit charges" to reserve the right to connect to the Plant in the future. The Plant, through the Talbot County Sanitary District, also receives some funding (in the form of grants and low-interest loans) from the Maryland Department of the Environment ("MDE"). The Talbot County Council bears the ultimate responsibility for Plant management.

The Plant was to be constructed with a flow capacity of approximately 1,000,000 gallons per day ("GPD"). Through the year 2003, however, a study of the Plant's function showed

an actual flow capacity of approximately 500,000 GPD, with more than 170 problems reported in the collection system. In recognition of these issues, the Talbot County Council voted to authorize expansion of the Plant on August 12, 2003, so that the Plant's actual capacity would increase to 660,000 GPD. As of July 2005, the County had yet to begin construction on the expansion, and had not received a construction permit from the MDE allowing the expansion to proceed.

On April 5, 2005, rainstorms caused approximately 300 gallons of untreated sewage to overflow from the Plant's collection system into the Miles River. Three days later, continuing heavy rains and local flooding caused sewers in the Town of St. Michaels to overflow, releasing approximately 2,400 gallons of raw sewage into the Miles River. On May 20, 2005, an additional 850 gallons of untreated sewage overflowed into the Miles River.

### The Miles Point Property

The first parcel of land at issue in this case, consisting of seventy-two acres of undeveloped land, is owned by Respondent Miles Point Property, LLC, and is located in the Town of St. Michaels. The Miles Point property is designated as "S–2" in the Talbot County Comprehensive Water and Sewer Plan (the "Plan"). Properties designated as S–2 under the Plan are contemplated for improvements, extensions, or construction of shared sanitary facilities within three to five years "following the date of adoption of the Plan and/or amendments or revisions thereto."

On February 24, 2005, Miles Point, through the Town of St. Michaels, submitted an application to Talbot County to reclassify the property as "S–1" under the Plan. This change would designate the property as having "immediate priority status" for the purposes of extending shared sanitary facilities to service development of the property.[4] Miles Point claims that it did not seek immediate installation of sewerage hook-ups

---

4. "Immediate priority," in this context, applies to "a work or works of community, multi-use, or shared sanitary facilities for which final planning or design is completed or in progress and where the beginning

("allocation") when making this request, but instead sought only to change the property's designation under the Plan. Talbot County interpreted Miles Point's application as requesting an allocation.

On April 12, 2005, after the two reported incidents of sewage overflow occurring in April due to heavy rains and flooding, the Talbot County Council introduced Resolution No. 124 to amend the Plan per Miles Point's request. A public hearing on the resolution was held on May 10, 2005. The Council met on May 17, 2005, to evaluate the merits of the application, and ultimately decided against reclassification. On July 12, 2005, more than two months after the May sewage overflow, the Council adopted findings of fact relating to the resolution, and voted unanimously against the resolution.[5]

Miles Point appealed the Council's decision to the Talbot County Board of Appeals. The Board considered the issue in

_____

of construction is scheduled to start within two (2) years following the date of adoption of the Plan, and/or amendments and revisions thereto."

**5.** The Council's findings of fact included, in part, the following specific findings about the Miles Point property and proposal:

[Miles Point] is proposing 271 residential dwelling units, 8 live/work units, 6 public showers, 6 public toilets, 12,500 square feet of retail space, and a 24 room inn with restaurant, which equates to 307.25 equivalent dwelling units ("EDUs").... The Property is currently classified "S–2," ... [and Miles Point] requests reclassification to "S–1,"....

＊＊＊

The Application requests 8,750 [GPD] from existing capacity before construction of the Plant upgrade to increase capacity from 500,000 [GPD] to 660,000 [GPD].... The schedule for 2007 and 2008 requests 17,050 [GPD] from the 160,000 [GPD] capacity that will be added by the Plant upgrade. However, the Plant upgrade will not be completed until at least August 2008, making the new capacity unavailable for allocation during 2007 and at least half of 2008. The Application's construction schedule is unrealistic and inconsistent with the availability of that new capacity.

Notwithstanding that inconsistency the Application ties issuance of building permits to that schedule.... The Application requested approval of the entire project and, if approved, would have required the Talbot County Health Officer to sign the subdivision plat for the entire project upon submission by the Town of St. Michaels.

a public hearing on December 5, 2005. On April 19, 2006, the Board issued a unanimous written decision dismissing the appeal for lack of jurisdiction. The Board held that its power to hear appeals from Council decisions was circumscribed by authority granted to it by the Council, pursuant to Article 25A, Section 5 of the Maryland Code (the "Express Powers Act"), and that the Council had not specifically delegated review authority over the Plan (or requests to modify its terms) to the Board. The Board further held that it did not have such review authority under Section 502 of the Talbot County Charter ("the Charter"), which confers jurisdiction over appeals from "executive, administrative, or adjudicatory" orders. The Board held that the decision not to designate the Miles Point property as S–1 under the Plan was not such an order.

Miles Point sought judicial review of the Board's decision in the Circuit Court for Talbot County, arguing that the Board did in fact have the authority to review the Council's decision. On August 8, 2008, the Circuit Court reversed the Board's decision, stating that although there was no separate enabling legislation specifically authorizing an appeal relating to the Plan, Section 502 of the Charter nonetheless conferred upon the Board the authority to hear such an appeal.

On August 28, Talbot County timely appealed to the Court of Special Appeals from the Circuit Court's decision. The County argued that the Express Powers Act did not permit the Board to review the Council's decision on appeal, and that even if this were not the case, neither the Charter nor any other local law conferred specific jurisdiction on the Board.

### The Shore Lands Property

The second parcel of land at issue in this case, consisting of seventy-nine acres of undeveloped land, is owned by Shore Lands, LLC, and is located in the Town of Easton. The Shore Lands property is classified "W–2/S–2" in the Plan. (The additional W–2 designation on the Shore Lands property applies to water service, as opposed to S–2, applicable to sewer service; water and sewer services follow the same

priority schedule.) On January 19, 2006, Shore Lands applied to Talbot County to designate the Shore Lands property as "W–1/S–1" under the Plan. On September 25, 2007, the Council introduced Resolution No. 146 to classify the Shore Lands property as W–1/S–1, with a public hearing scheduled for November 27, 2007.

The Town of Easton opposed the reclassification at the hearing. In 2004, Easton had received loans and grants from the State of Maryland in order to effect an upgrade of the Town's sewer treatment plant. As part of that agreement, Easton represented that certain land within its borders, including the Shore Lands property, would only be developed according to the terms of the State's Smart Growth Law, which sets habitation density standards (in this case, a minimum of 3.5 dwellings per acre) for areas designated for development. The Shore Lands property, as zoned ("Agricultural," or "A–1"), required a lesser habitation density (a maximum of 1.0 dwellings per acre). Easton claimed that the Shore Lands property was included in its agreement with the State only through an error on the part of the MDE, and that the Town was working with the MDE to correct the error. Nonetheless, Easton was concerned that classifying the Shore Lands property as W–1/S–1 would allow for immediate development of the land at less than the State's minimum habitation density requirements, thereby jeopardizing Easton's funding agreement with the State.

The Council adopted findings of fact pertaining to the Shore Lands property on December 18, 2007, and based on those findings, voted 4–1 to reject Resolution No. 146. In response, Shore Lands filed a Complaint for Writ of Administrative Mandamus in the Circuit Court for Talbot County, seeking review of the Council's decision to deny re-designation[6]. The Circuit Court, in a memorandum opinion issued September 26, 2008, dismissed the petition for mandamus. The court cited

---

6. Shore Lands also filed an administrative appeal to the Board. The parties agreed to stay those proceedings while the Circuit Court heard the complaint for mandamus.

its judgment in the Miles Point case in ruling that Shore Lands had failed to exhaust its administrative remedies before pursuing a writ of mandamus, and that the proper mechanism to review the Council's ruling initially was an appeal to the Talbot County Board of Appeals.

On October 24, 2008, Talbot County timely appealed the Circuit Court's decision to the Court of Special Appeals, arguing that the Board lacked jurisdiction to hear an appeal from the Board's decision, and that invoking the original jurisdiction of the Circuit Court was the proper procedure.

### The Parties' Positions

With the facts and procedure so aligned, each of the four parties in this case (Talbot County, Miles Point, Shore Lands, and the Town of Easton) argues for a different result. Talbot County asks us to reverse the judgment of the Circuit Court in both cases, and hold that the Board lacks jurisdiction to hear an administrative appeal relating to decisions not to amend the properties' designations in the Plan. The County further argues that judicial scrutiny of a Council decision on the Plan requires invoking the original jurisdiction of the Circuit Court, and that a complaint for a writ of administrative mandamus would be the proper vehicle for review.

Shore Lands agrees with Talbot County that the Board lacks authority to hear such an appeal, and argues that the Circuit Court had jurisdiction to hear Shore Lands's mandamus action regarding the Council's decision. Shore Lands argues that seeking a writ of administrative mandamus is a proper mechanism for review. Accordingly, Shore Lands asks us to hold that it had not failed to exhaust its administrative remedies when it sought a writ of administrative mandamus in the Circuit Court, and that the Circuit Court erred in dismissing the writ.

Like Talbot County, the Town of Easton argues that this Court should hold that the Council's rejection of Resolution No. 146 was a legislative act, and that it is not appealable to the Board. Easton further claims, however, that administra-

tive mandamus does not lie in this case, because that remedy is not appropriate for reviewing the Council's discretionary legislative acts. Easton argues that we should therefore affirm the Circuit Court's dismissal of Shore Lands's complaint.

Finally, Miles Point argues that the Board had jurisdiction to hear its appeal from the Council's decision. It claims that it is consistent with the Express Powers Act for the Board to have jurisdiction over the appeal, and that the authority conferred on the Board by the Talbot County Charter is an actual grant of authority to the Board sufficient to sustain the Board's jurisdiction. Miles Point therefore asks this Court to affirm the Circuit Court's judgment that the Board was required to hear Miles Point's appeal from the Council's decision.

## DISCUSSION

In order to resolve the questions presented by the parties, we will address three issues. First, we must decide whether the Council's decisions were subject to review by the Board. Second, if the Council's decisions were not subject to review by the Board, we must decide if the Circuit Court for Talbot County has jurisdiction to review the Council's decisions. Third, if that court has jurisdiction to review the decisions, we must decide the proper mechanism for review.

The diversity of parties and interests in this case, however, creates an unusual situation with respect to our analysis and our holdings. Miles Point's principal argument is that the Board should be permitted to review the Council's decisions on water and sewer reclassification of property. Likewise, Shore Lands's principal argument is that seeking a writ of administrative mandamus from the Circuit Court is a proper avenue for reviewing the Council's decisions. Although each of these parties approaches the legal questions presented in a different fashion, our analysis will depend largely on resolution of an issue common to all, i.e., whether the Council acted in a legislative fashion or an adjudicative fashion in making its

decisions. We resolve this issue below, after stating our standard of review.

## Standard of Review

■ The judgments of the Circuit Court for Talbot County and the decisions of the Talbot County Board of Appeals in these cases pertained solely to conclusions of law respecting jurisdiction. As such, we owe no deference to those decisions, and will review them de novo. *See Belvoir Farms Homeowners Ass'n v. North,* 355 Md. 259, 267, 734 A.2d 227, 232 (1999) ("Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law."); *see also Nesbit v. Gov't Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004) ("When the trial court's order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.") (quotation marks and citation omitted).

## The Miles Point Property and the Talbot County Board of Appeals

■ The Talbot County Board of Appeals's review authority over the Council's decisions, if it exists, must derive from the General Assembly's grant of power contained within the Express Powers Act, because Talbot County has elected a charter form of local government. *See* Md.Code (1957, 2005 Repl.Vol.), Art. 25A, § 5 ("Express Powers Act" or "the Act"). Maryland Constitution Article XI–A, Section 2, provides that "[t]he General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article." MD. CONST. art. XI–A, § 2. The Express Powers Act is the General Assembly's fulfillment of this constitutional command. *See Anne Arundel County v. Bowen,* 258 Md. 713, 715, 267 A.2d 168, 169 (1970) (explaining that the statute was enacted "[i]n obedience to [Article XI–A's] mandate ....."); *see also County Council for Montgomery County v. Investors Funding*

*Corp.*, 270 Md. 403, 418, 312 A.2d 225, 233 (1973) (holding that the purpose of the Act "is to share with the counties, within well-delineated limits, the legislative powers formerly reserved to the General Assembly.").

The Express Powers Act confers a number of "enumerated express powers" upon charter counties, including Talbot County. Express Powers Act, §§ (A)-(FF). Among these enumerated powers is the ability to create a County Board of Appeals, codified in Paragraph (U) of the Act. Specifically, that paragraph permits a charter county to "enact local laws providing . . . for the establishment of a county board of appeals whose members shall be appointed by the county council. . . ." *See* Express Powers Act, § (U). Although the Act grants no direct authority to a board of appeal, as this must be implemented by the charter county, it limits which matters counties may authorize their boards to review:

> [T]he decision by the board on petition by any interested person and after notice and opportunity for hearing and on the basis of the record before the board, of such of the following matters arising (either originally or on review of the action of an administrative officer or agency) under any law, ordinance, or regulation of, or subject to amendment or repeal by, the county council, as shall be specified from time to time by such local laws enacted under this subsection: *[a]n application for a zoning variation or exception or amendment of a zoning ordinance map; the issuance, renewal, denial, revocation, suspension, annulment, or modification of any license, permit, approval, exemption, waiver, certificate, registration, or other form of permission or of any adjudicatory order. . . .*

*See* Express Powers Act, § (U) (emphasis added). We shall refer to the italicized language as the "Limiting Clause" of the Act.

The question of the Board's jurisdiction, as Talbot County argues in its brief, is thus predicated on the language of the Express Powers Act. The critical issue is whether an appeal from a denial of an amendment to the Plan can be read, in the

words of Miles Point, as being "consistent" with one of the spheres of jurisdiction enumerated in the Limiting Clause of the Act. In other words, does the Express Powers Act even permit a county to authorize its Board of Appeals to review the council's denial of this type of decision? [7]

The Talbot County Board of Appeals, in considering its jurisdiction over Miles Point's appeal, did not expressly find that review of a proposed amendment to the Plan fairly fit within the enumerated list of subject matters set forth in the Limiting Clause of the Express Powers Act; the Board found that even if such an appeal were permissible under the Limiting Clause, the Council had not authorized the Board to hear such an appeal through the enactment of a local law. Miles Point argues that the Limiting Clause allows its appeal, pointing to the general category of jurisdiction permitting a county to delegate review authority over the "denial . . . of any adjudicatory order" to its Board of Appeals.[8] Express Powers Act, § (U). Talbot County argues that the Council's action was legislative in nature, and therefore lacked the quasi-judicial quality that is characteristic of an adjudicatory order.[9]

---

7. A county's powers cannot exceed those granted to it by the General Assembly. *See* MD. CONST. art. XI–A, § 2 ("Such express powers granted to the Counties . . . shall not be enlarged or extended by any charter formed under the provisions of this Article. . . ."). Therefore, any vesting of review authority in the Board through the enactment of local laws would be void if the subject matter in question breached the outer bounds of the Act.

8. Miles Point also argues, without citation or support, that the Council's rejection of the Plan amendment was denial of a permit or license for the purposes of Paragraph (U). This position is untenable, as the passage of Resolution No. 124 would not actually have licensed Miles Point to engage in any particular activity, nor would Miles Point have received any permit after a successful Plan amendment.

9. Neither Talbot County nor Miles Point argues that the Council's denial of the amendment would fall within the definition of an "application for a zoning variation or exception or amendment of a zoning ordinance map" as permitted under Paragraph (U). We thus need not address this issue specifically. We have previously held, however, that "all amendments to a Master Water and Sewer Plan are, by definition,

■ In determining whether the Council's action was adjudicatory or legislative in nature, we are informed by our analysis of zoning decisions in *Bucktail, LLC v. County Council of Talbot County,* 352 Md. 530, 723 A.2d 440 (1999). In *Bucktail,* we held:

> The determination of whether a local zoning authority is acting in an adjudicative or legislative manner is dependent upon the nature of the particular act in which it is engaged. This determination is not based on whether the zoning decision adversely affects an individual piece of property but whether the decision itself is made on individual or general grounds.

*Id.* at 545, 723 A.2d at 447 (quotation marks and citation omitted). It is thus not a hearing's "mere focus on one parcel that is dispositive of [the hearing's] quasi-judicial nature, but rather that the matter taken up at the hearing is disposed of based on the unique characteristics" of the property at issue. *Md. Overpak Corp. v. Mayor & City Council of Balt.,* 395 Md. 16, 39, 909 A.2d 235, 248–49 (2006). In other words, the greater a decisionmaker's reliance on general, "legislative facts," the more likely it is that an action is legislative in nature. Likewise, the greater a decision-maker's reliance on property-specific, "adjudicative facts," the more reasonable it is to term the action adjudicatory in nature.

Although we have recognized that "[t]he difference between adjudicative and legislative facts is not easily drawn[,]" *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 711–12, 376 A.2d 483, 497 (1977), the proper classification of the Council's hearings in these cases is quite straightforward. Generally, adjudicative facts concern questions of "who did what, where, when, how, why, [and] with what motive or

---

comprehensive planning actions[,]" and that the fact that "amendments to [a] Plan occur in small steps does not mean that the inherent planning process is transformed into a 'zoning action.'" *Appleton Reg'l Cmty. Alliance v. County Comm'rs of Cecil County,* 404 Md. 92, 104, 945 A.2d 648, 655 (2008). This reasoning suggests that a Plan amendment would not be covered by the "zoning variation" language in Paragraph (U).

intent," while legislative facts "do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." *Id.* (*quoting* 1 Kenneth C. Davis, *Administrative Law Treatise* § 7:02 (1958)). While the Council's review of the Plan was spurred by Miles Point's request for reclassification, few of the facts discussed by the Council address unique characteristics of the Miles Point property itself.

As stated above, the Council does iterate the particulars of Miles Point's application, and identify the property in question, but only at the outset of its findings. The balance of the Council's findings address broad-based facts relating to Talbot County infrastructure, the capacity and history of the Region II Wastewater Treatment Plant, and policy issues. Specifically, the Council discussed a number of problems with existing sewage treatment procedures. The Council found that the Plant had experienced a steady increase in wastewater inflow between 2002 and 2005, and a corresponding decrease in available capacity for additional treatment. The Council also noted that peak flows into the Plant could reach 2,000,000 GPD—twice the Plant's design capacity and approximately four times its total functional capacity. The findings of fact addressed the sewage overflow issues that the Plant had experienced, and the litany of problems that had been revealed by an inspection of the Plant's function. The Council also discussed Talbot County's agreement with the Martingham Utilities Cooperative, a private sewage treatment facility located north of the Town of St. Michaels. The County had previously agreed that the Plant would accept an additional 19,000 GPD of effluent from the Martingham facility to assist that facility in meeting its MDE permit requirements.

In addition to these findings, the Council addressed policy matters. The Council discussed the County's plan to expand Plant capacity, and noted that in spite of the County's intentions, the expansion had not yet been authorized by the MDE, "[n]o bid [had] been approved[,] . . . and no construction contract [had] been executed." The Council addressed the history of sewer allocation policy in Talbot County, including

the County's larger water and sewer planning scheme in relation to the Plant's historical capacity, and found that granting Miles Point's application would be incompatible with the overall scheme as organized by the County as early as 1987.[10] The Council's findings of fact also acknowledge that the Talbot County Planning Commission, the Public Works Advisory Board, and the County Engineer recommended that the resolution be rejected; both the Planning Commission and the Public Works Advisory Board were unanimous in their recommendations.

Finally, the Council discussed the requirements of state law, specifically the requirements of the Maryland Code's Environment Article. Among other items, the Council referred to Section 9–505(a)(4)(i) of the Environment Article, which requires that each county provide "[f]or sewage treatment facilities that are adequate to prevent the discharge of any inadequately treated sewage or other liquid waste into any waters...."[11] Md.Code (1982, 2007 Repl.Vol.) § 9–505(a)(4)(i) of the Environment Article. The Council found that "[a]mending the Plan to allow additional hook-ups when the Plant does not have sufficient capacity to accept and adequately treat existing flows without discharge ... is inconsistent with the requirements of [the Environment Arti-

---

**10.** As mentioned above, there is some dispute as to whether Miles Point was requesting mere reclassification of its property's Plan designation, or whether Miles Point was requesting allocation (i.e., actual sewerage hook-ups) as well. The Council's findings of fact refer to "allocation" in finding an incompatibility between Miles Point's application and the County Plan. The findings indicate that although Miles Point attempted to amend its application to specify that it was not seeking allocation, that attempt to amend could not be applied because Resolution No. 124 had already been introduced, and the amendment could not be applied retroactively because hearings on the matter had been publicly advertised as required by law. The Council also found that Miles Point made no effort to introduce a substitute or amended resolution. Our analysis would not differ whether Miles Point sought allocation or not—the Council's analytical process was primarily informed by legislative facts regardless of which approach it considered.

**11.** The Council mistakenly refers to Section 9–504(a)(4)(i) in its findings, but the quoted language within the findings is from Section 9–505(a)(4)(i).

cle]." [12] The Council later stated that granting such an approval would be "inimical to the public health, safety, and welfare." [13]

---

12. The legislative character of the Council's decision is suggested by the broad, policy-oriented parameters within the sections of the Environment Article addressing county water and sewer plan requirements. For example, Section 9–505 of the Environment Article states that any plan must

> (5) Provide for facilities that are adequate to treat, recover, or dispose of solid waste in a manner that is *consistent with the laws of this State* that relate to air pollution, water pollution, and land use ...
>
> * * *
>
> (7) Tak[e] into account *all relevant planning, zoning, population, engineering, and economic information and all State, regional, municipal, and local plans,* [and] describe, with all practical precision, those parts of the county that reasonably may be expected to be served in the next 10 years by [water and sewer systems.]

Md.Code (1982, 2007 Repl.Vol.), § 9–505(a) of the Environment Article (emphasis added). These provisions are identical in all versions of the Environment Article that were in effect during the events in this case.

This emphasis is reflected in the Talbot County Comprehensive Water and Sewer Plan itself, which also speaks in strategic, policy-oriented terms:

> The incorporated towns [including the Towns of Easton and St. Michaels] are the best locations for *future residential, commercial and industrial growth and development.* Growth in the incorporated towns *will reduce the outward sprawl of development* and keep new growth within existing centers where adequate public facilities and services ... can be efficiently provided.... The compact development form and investments in infrastructure in the County's towns offer opportunities for maximum use of facilities *to support growth through new development, infill development, and creative redevelopment in appropriate locations.*

(Emphasis added.)

13. The Council's reference to "public health, safety, and welfare" echoes a number of provisions within the Express Powers Act known as "general welfare clauses," which grant charter counties broad power to enact laws to improve the general welfare of their citizens. *See Montgomery Citizens League v. Greenhalgh,* 253 Md. 151, 161, 252 A.2d 242, 247 (1969) (discussing general welfare clauses). Among the general welfare clauses in the Act is one relating to zoning and planning, allowing a county to "enact local laws, for the protection and promotion of public safety, health, morals, and welfare, relating to zoning and planning...." Md.Code (1957, 2005 Repl.Vol.) § 5(X)(1)(i) of Art. 25A. We have held that a county's exercise of authority pursuant to general welfare clauses is legislative action. *See Ritchmount P'ship v. Bd. of Supervisors of Elections,* 283 Md. 48, 57, 388 A.2d 523, 529 (1978). While this provision is not precisely on point—the Council was

All of the above facts relied upon by the Council were legislative in nature, as not one of the Council's grounds for decision was specifically rooted in the unique characteristics of the Miles Point property or the associated development proposal. Throughout its findings of fact, the Council invariably chose not to focus on the merits and flaws of reclassifying Miles Point's specific property, but rather on how that reclassification would fit into Talbot County's overall policy on wastewater treatment. At no point did the Council indicate that there was a particular feature of the Miles Point property, or its development proposal, that made reclassification untenable; the Council's rationale could easily have applied to any property classified as S–2 under the Plan.

To be sure, the ultimate decision reached by the Council specifically affected the Miles Point property. But this does not transform the Council's decision into adjudicatory action. We have held in other contexts that a single decision-making process may require both legislative and adjudicative roles for the hearing body. *See Mayor & Council of Rockville v. Woodmont Country Club,* 348 Md. 572, 584–85, 705 A.2d 301, 306–07 (1998) (holding that the process of enacting a special assessment may include both legislative and adjudicative aspects).

Applying these criteria, we have no doubt that the Council relied primarily upon legislative fact-finding in making its decision on the Miles Point property, and that its action was therefore legislative in nature.[14] Again, we must focus on whether the Council's decision itself was made on individual grounds or general grounds. *See Bucktail,* 352 Md. at 545,

---

rejecting a resolution, as opposed to enacting one, and the Council did not explicitly rely on a general welfare clause in making its decision—it nonetheless helps to illustrate how a county's legislative powers can extend to actions taken with regard to its water and sewer plan.

**14.** The Council also rejected reclassification of the Shore Lands property, but neither Shore Lands, Talbot County, Miles Point, nor the Town of Easton argue that the Board of Appeals should have had jurisdiction over the Council's action with respect to that property. We therefore do not consider that issue.

723 A.2d at 447. In this case, the Council's decision was clearly based on general grounds. As such, it was not an adjudicatory action and, under the Limiting Clause of the Express Powers Act, Talbot County may not confer appellate jurisdiction over the Council's decision on the Talbot County Board of Appeals. The Board thus correctly determined that it lacked jurisdiction to hear Miles Point's administrative appeal from the Council's decision, and the Circuit Court for Talbot County erred in its judgment remanding Miles Point's appeal to the Board.

*The Shore Lands Property and the Circuit*
*Court for Talbot County*

As we have held that the Board of Appeals did not have jurisdiction to review the Council's legislative decisions not to reclassify properties for Plan purposes, we must now address whether the Circuit Court for Talbot County has such jurisdiction. In briefing this issue, Shore Lands argues that the Circuit Court has jurisdiction, and that administrative mandamus is the proper mechanism for review of the Council's action.[15] The Town of Easton rebuts these arguments for administrative mandamus, and also argues against common law mandamus.

We will consider both administrative mandamus and common law mandamus as potential remedies in Shore Lands's case. The function of a writ of mandamus is to "compel inferior tribunals, public officials or administrative agencies to perform their function[s], or perform some particular duty imposed upon them ... [where] the party applying for the writ has a clear legal right" to the performance of that

---

**15.** Talbot County agrees with Shore Lands that the "Complaint for Writ of Administrative Mandamus against the County Council in Circuit Court ... was the correct procedure to challenge the Council's vote against Resolution [No.] 146[,]" and that this Court should "remand [the] case to the Circuit Court with instructions to decide [the] case on its merits." The County does not, however, explain why it takes this position, or why administrative mandamus would be a proper review mechanism in the Circuit Court.

duty. *Casey v. Mayor & City Council of Rockville,* 400 Md. 259, 317, 929 A.2d 74, 109 (2007) (quotation marks and citations omitted). In this way, a writ of mandamus is an equitable remedy, akin to specific performance. *See Ipes v. Bd. of Fire Comm'rs of Balt.,* 224 Md. 180, 183, 167 A.2d 337, 339 (1961).

■ Even if mandamus does not lie here, however, the Council's actions are not completely insulated from judicial scrutiny. Legislative action by a local government or agency is still subject to review by the courts, though the standard of review is extremely narrow. Judicial scrutiny of legislative action under a court's ordinary jurisdiction "is limited to assessing whether [a government body] was acting within its legal boundaries." *County Council of Prince George's County v. Offen,* 334 Md. 499, 507, 639 A.2d 1070, 1074 (1994) (quotation marks and citation omitted). This is an even more limited standard than the already narrow review for arbitrary and capricious action, or for action unsupported by substantial evidence. *Cf. Judy v. Schaefer,* 331 Md. 239, 264–66, 627 A.2d 1039, 1052–53 (1993) (discussing judicial review of administrative decisions).

■ Under this "legal boundaries" standard, government legislative action will be permitted to stand as long as it was "consistent with relevant law." *Id.* If the legislative action exceeds the acting agency's legal authority, however, the courts have the power to correct the extralegal conduct pursuant to their original jurisdiction. *See, e.g., Medstar Health v. Md. Health Care Comm'n,* 376 Md. 1, 20–21, 827 A.2d 83, 95–96 (2003) (discussing the availability of a declaratory judgment in "legal boundaries" review of administrative rulemaking, a legislative action); *see also Armstrong v. Mayor & City Council of Balt.,* 169 Md.App. 655, 666–68, 906 A.2d 415, 421–23 (2006) (holding that a court may act by issuing an injunction, a declaratory judgment, or a writ of mandamus). Thus, if mandamus does not lie as an extraordinary remedy in these cases, the Council's actions will still be subject to review, and if necessary to correction, under this narrower standard.

Administrative Mandamus

█ Shore Lands argues that the Council would be subject to a writ of administrative mandamus issued by the Circuit Court. Administrative mandamus proceedings are governed by Maryland Rules 7–401 through 7–403. This is our first occasion to comment explicitly on these rules, which entered our canon in 2006, although this Court has long acknowledged the concept of administrative mandamus as an extension of the common law writ of mandamus. *See Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945) (holding that courts have "the inherent power, through the writ of mandamus . . . to correct abuses of discretion" committed by administrative agencies); *see also Bowen v. City of Annapolis,* 402 Md. 587, 610–13, 937 A.2d 242, 256–57 (2007) (discussing review of administrative agency decisions under the Administrative Procedure Act).

Maryland Rule 7–401 outlines the requirements for a writ of administrative mandamus:

Rule 7–401. General Provisions.

(a) Applicability. The rules in this Chapter govern actions for judicial review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law.

(b) Definition. As used in this Chapter, "administrative agency" means any agency, board, department, district, commission, authority, Commissioner, official, or other unit of the State or of a political subdivision of the State.

(Emphasis removed.) The plain language of the Rule dictates that in order for administrative mandamus to lie in any given case, the underlying action being reviewed must be quasi-judicial in nature, where quasi-judicial action is synonymous with administrative adjudication, *see Maryland Overpak,* 395 Md. at 33 n. 14, 909 A.2d at 245 n. 14, and contrasts with legislative action. We are thus faced with the same issue presented in our discussion of the Miles Point property: whether the Council's action in rejecting Shore Lands's application is legislative in nature.

We reiterate that it is not a hearing's focus on a particular parcel of land that proves the hearing was quasi-judicial in nature, but rather that "the matter taken up at the hearing is disposed of based on the unique characteristics" of that property. *Md. Overpak,* 395 Md. at 39, 909 A.2d at 248–49. The greater a decision-maker's reliance on specific facts relating to a parcel of land, the more likely that the decision made is adjudicatory in nature. *See Woodward & Lothrop,* 280 Md. at 712, 376 A.2d at 497. Decisions that are largely predicated on general facts, and on issues of law and policy, are legislative in nature. *Id.*

An examination of the Council's findings of fact regarding the Shore Lands property shows that the Council based its decision largely on legislative facts. The Council discusses the Shore Lands property at the beginning of its findings, including the history of Shore Lands's application and the classification history of the parcel itself. After this initial assessment, however, the Council leaves behind its property-specific discussion, and segues into a larger discussion of the Talbot County Plan.

Unlike its analysis of the Miles Point property and the development proposal for that property, the Council did not focus on the County's sewage processing infrastructure in considering Shore Lands's application. Indeed, the Council found that "adequate capacity apparently exists to serve the [Shore Lands] property with sewer and water and necessary infrastructure is located adjacent to the property . . . ." Rather, the Council found that reclassification of the Shore Lands property as currently zoned "would be inconsistent with the State Smart Growth Law . . . and potentially problematic in terms of the Town of Easton's [funding agreements] with the State of Maryland." The Council also found that the Plan "specifically discourages development of properties in growth areas at 'low "septic system" densities[,]' " and that reclassification would run afoul of this strategic goal.

The Council further noted that the Talbot County Planning Commission had found that reclassification of the Shore Lands

property would be inconsistent with the Plan. Specifically, the Council acknowledged the Commission's understanding that "the development of the property under an A–1 zoning would violate the recommendations related to density in growth areas [by promoting] rural or suburban densities within the Town growth area." The Council found that the Public Works Advisory Board also opposed reclassification. Ultimately, the Council concluded that reclassification "would not provide for the orderly expansion and extension of water and sewer service in a manner consistent with both County and Town comprehensive land use plans[,]" and that the existing classification was "most consistent with the orderly expansion and extension of such services."

At no point during the findings of fact leading to this conclusion did the Council indicate a focus on the unique characteristics of the Shore Lands property. Rather, the Council directed its attention to matters of law and policy, including the long-range development strategy of Talbot County. Significantly, reclassification of any A–1 zoned property in Easton's growth area would have proved incompatible with the County's long-range plans. These aspects of the decision-making process are all consonant with legislative action, and not adjudicatory action. Again, the impact on the Shore Lands property does not make the action adjudicatory (or "quasi-judicial," in the words of Maryland Rule 7–401). *See Bucktail,* 352 Md. at 545, 723 A.2d at 447 (holding that the relevant inquiry is not whether a decision "adversely affects an individual piece of property but whether the decision itself is made on individual or general grounds."). Because the Council's action was not quasi-judicial in nature, administrative mandamus will not lie in this case, and the Circuit Court was correct in dismissing Shore Lands's complaint.

### *Common Law Mandamus*

A writ of common law mandamus may issue from any court of law in Maryland. *See* Md.Code (1973, 2006 Repl.Vol.) § 3–8B–01 of the Courts & Judicial Proceedings Article. We have long held that common law mandamus is a remedy only

in cases involving ministerial acts, and not discretionary ones. *See Wilson v. Simms,* 380 Md. 206, 223–24, 844 A.2d 412, 423 (2004) ("[W]here the exercise of discretion is permitted, mandamus ordinarily will not lie."); *see also Green v. Purnell,* 12 Md. 329, 336, 1858 WL 3256, *5, 1858 Md. LEXIS 31, *13 (1858) (holding that mandamus "cannot issue in a case where discretion and judgment are to be exercised ... it can be granted only where the act required to be done is merely ministerial. . . ."). In short, common law mandamus is inapplicable when it interferes with the "legislative prerogative[.]" *Glen Burnie Improvement Ass'n v. State Appeal Bd.,* 213 Md. 407, 412, 132 A.2d 451, 453 (1957); *see also 2–26 Antieu on Local Government Law* § 26.18 (2d Ed.) (stating that mandamus will lie only where an agency or official has engaged in ministerial functions, as opposed to either quasi-judicial or legislative functions).

 Common law mandamus will not lie in this case according to these principles. As we have already held, the Council's actions were legislative; they did not rise to the level of even quasi-judicial action, much less mere ministerial action. Only when an official's duties are "absolute, certain, and imperative, involving merely the execution of a set task" can they be fairly defined as ministerial. *James v. Prince George's County,* 288 Md. 315, 326, 418 A.2d 1173, 1179 (1980) (*quoting Doeg v. Cook,* 126 Cal. 213, 58 P. 707, 708 (1899)). Ministerial acts are "duties in respect to which nothing is left to discretion [and are] distinguished from those [allowing] freedom and authority to make decisions and choices." *State, Use, Clark v. Ferling,* 220 Md. 109, 113, 151 A.2d 137, 139 (1959). There is no doubt that the Council, in voting on the resolutions at issue here, was exercising its discretion. Indeed, at the November 27, 2007, hearing on Shore Lands's property, Shore Lands's counsel stated:

> *Our position is not that because we're at the five year period* [associated with a W–2/S–2 classification] *that* [reclassification] *automatically has to happen.* Our position is we have satisfied the requirements in the water and sewer plan. The designations are the result of a planning pro-

cess.... [I]f we had a six to ten year [designation] and we met the other requirements in the plan, we still would have the right to come in and ask for an upgrade to the designation. *It's not a prohibition or guarantee,* but the requirements of the water and sewer plan mean something and the County is obligated to follow those.

(Emphasis added.) Because the Council was acting in a legislative capacity, and not a ministerial one, common law mandamus does not lie in this case.

## CONCLUSION

The Talbot County Council's refusals to reclassify the Miles Point and Shore Lands properties were legislative actions. Because the actions were legislative in nature and not adjudicatory, they are not reviewable under the terms of the Express Powers Act, Paragraph (U). In addition, mandamus does not lie to review these actions. Administrative mandamus is limited to cases where the underlying action is quasi-judicial, which is not the case here. Common law mandamus is limited to cases where the underlying action is ministerial, which is also not the case here. The Council's actions are still nonetheless subject to review in the Circuit Court to assess if the Council was acting within its legal boundaries.

The Circuit Court for Talbot County thus erred in finding that the Board had jurisdiction to hear the appeal from the Council's action in the Miles Point case. The Circuit Court did not err in dismissing Shore Lands's Complaint for Writ of Administrative Mandamus, although it did err in requiring Shore Lands to seek an administrative appeal with the Board. The judgment of the Circuit Court in the Miles Point case is reversed. The judgment of the Circuit Court in the Shore Lands case is affirmed with respect to the dismissal of Shore Lands's complaint, and reversed insofar as it required Shore Lands to seek an administrative appeal before the Board.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY REVERSED WITH RESPECT TO RESPONDENT MILES POINT. JUDGMENT OF THE CIRCUIT**

COURT FOR TALBOT COUNTY AFFIRMED IN PART AND REVERSED IN PART WITH RESPECT TO RESPONDENT SHORE LANDS. COSTS IN THIS COURT TO BE SHARED EQUALLY BY RESPONDENTS MILES POINT AND SHORE LANDS.