23 A.3d 323

Adam M. O'BRIEN, et al.

v.

BOARD OF LICENSE COMMISSIONERS
FOR WASHINGTON COUNTY.

No. 2081, Sept. Term, 2009.

Court of Special Appeals of Maryland.

July 5, 2011.

**564**

Evangelos D. Sidou, Towson, MD, for appellant.

Susan M. Lochbaum (John R. Salvatore, on the brief), Hagerstown, MD, for appellee.

Panel: ZARNOCH, MATRICCIANI, and HOTTEN, JJ.

ZARNOCH, J.

Appellants, Adam O'Brien and DeCourcy's Pub, LLC ("O'Brien") brought a hybrid action *pro se* in the Circuit Court for Washington County to gain the right to renew and transfer a Class D alcoholic beverages license. With elements of mandamus, injunction and petition for judicial review, this hybrid, even if it were powered by gas, electricity or good, old-fashioned elbow grease, could not arrive at appellants' desired destination. In addition, we conclude that O'Brien's customized method of travel in this litigation—administrative mandamus—is simply a non-starter. For reasons set forth below, we affirm the decision of the circuit court rejecting O'Brien's challenge and upholding the actions of appellee Board of License Commissioners for Washington County ("the Board").

## FACTS AND PROCEEDINGS

In October of 2006, Sharon and Michael Turner, owners of Chasers Bar and Grill, 139 North Mulberry Street in Hagerstown, sold their business to Adam and Christine O'Brien. O'Brien planned to operate an establishment known as De-Courcy's Pub at that address and set up a limited liability company for that purpose. However, complications soon arose.

Apparently, before the liquor license could be transferred, O'Brien had to overcome residency issues. Under the Rules of the Board of License Commissioners for the County ("the Board"):

> If an appellant does not meet the residence requirements above or is not a registered voter in Washington County because he/she is not a resident of the County, then the appellant shall appoint a person who meets these requirements as a resident agent for the license and give him/her at least a one percent (1%) interest in the entity (corporation) that owns the business.

BLC–005(c). To comply with this rule, O'Brien named Sharon Turner ("Turner") as "resident agent" with a one percent interest in DeCourcy's Pub, LLC.[1] Thus, Turner's name, as well as O'Brien's, was included on the license.

In addition, landlord-tenant problems surfaced. The Turners had leased the Mulberry Street property from William Marlow until August 2009, and Marlow was not willing to substitute O'Brien as a tenant. However, he appeared to be agreeable to allowing the Turners to sublease to O'Brien. As a result, in December 2006, an "addendum to Sales Contract" was entered into between the Turners and Adam O'Brien, which among other things: 1) acknowledged that Marlow would not release the Turners from the lease obligation; 2) subleased the property and set the monthly rent; 3) required O'Brien to pay real estate taxes; 4) set no term for the expiration of the lease [2]; 5) provided that if a default occurred because of a failure to pay rent, the Turners "would have the right to exercise immediate possession and ownership of the business...."[3]

---

1. In filings with the State Department of Assessments and Taxation, Adam O'Brien is listed as the resident agent of the LLC.

2. However, the August 2009 date for the end of the Turner lease would obviously end the sublease too.

3. An application for a new alcoholic beverages license must identify the "particular place for which a license is desired," Md.Code (1957, 2005

.

Subsequently, the Board approved O'Brien's application for a transfer of the license, and, evidently, renewals of the license in 2007 and 2008.[4]   However, all did not go well for DeCourcy's Pub: neighbors complained about the noise;  an attempt to lay the ground for moving the business to a new location stalled;  and O'Brien was under financial stress.   At an April 30, 2008 meeting of the Board, these problems surfaced.[5] O'Brien said:

> Well, the plan is to try to move the liquor license, once the lease has been fulfilled, to a commercial area, get it out of the residential area to try to just get the neighborhood off our back, really.   I don't see how it's gonna get a whole lot better.   We're gonna do the best we can in the meantime to control the problems, noise being the main one.   But first and foremost I have to take care of my lease and then after that, that's when I would want to come talk to you guys about any opportunity that I have to move within [the] voting district to a more commercial area.

Turner stated that when she asked O'Brien whether he was going to pay the rent, his response was "Your rent?   I don't have any money."   She added that she had paid the personal property taxes for O'Brien's limited liability company.   Turner said that she discussed the proposed move with the owner of

---

Repl.Vol.), Article 2B, § 10–103(b)(7) and "[t]he name of the owner of the premises upon which the business sought to be licensed is to be carried on. . . ." Article 2B, § 10–103(b)(8). In addition, the application must contain a statement by the owner of the premises "assenting to the granting of the license applied for. . . ." Article 2B, § 10–103(b)(17). With certain exceptions, the annual renewal application must also include "a statement signed by the owner of the premises consenting to renewal of the license. . . ." Article 2B, § 10–301(a)(1)(ii)3. When a transfer of a license is sought, the liquor board must also approve the new location "as in the case of an original application. . . ." Article 2B, § 10–503(a)(2)(iv).

**4.** Although appellant has referred to the license as No. 20080570 and No. 20080571, for purposes of clarity, we will refer to the license in the singular.

**5.** Minutes of the April 30th meeting labeled this colloquy: "DECOURCY'S PUB" DISCUSSION RE: TRANSFER. At this meeting, as in the five meetings subsequently described, all the witnesses were sworn in.

the building who said he would not let O'Brien out of the lease, "because he's not a very good tenant and he's not maintaining the property." Also speaking at the meeting was Alan Greenwald, described in the minutes as "developer and owner of property on Franklin Street," where apparently O'Brien sought to move. He echoed Turner's testimony about the recalcitrance of the owner of the building.

Board Chairman Robert L. Everhart responded to the witnesses: "The problem that you're having with the landlord is not something that we have any control over or are going to be involved in, unless something changes." Later, he added: "[U]ntil you all have a problem that affects your licensing, we're not gonna get involved...."

On July 9, 2008, O'Brien and Greenwald attended another meeting of the Board to discuss the proposed transfer to a new location. Turner was not present. After being sworn in, the witnesses described the reasons justifying a transfer and listened to advice from Chairman Everhart about how to proceed. O'Brien and Greenwald indicated that they planned to create a new LLC before an application would be filed. Chairman Everhart said: "Well, we don't have a problem with you putting your application in and I think, like I say, the main thing is you will have to have your LLC before you can do the advertising."

Before this new enterprise could flourish, DeCourcy's Pub floundered. The pub closed and its liquor license was taken by representatives of the Board.[6] On January 7, 2009, Turner appeared before the Board. She advised Board members that O'Brien "has not been paying the rent for the property, taxes or insurance." She said she would be meeting with her lawyer "about the possibility of getting the license back."

Less than a month later, O'Brien, Greenwald and Turner (represented by counsel) were back before the Board to

---

**6.** Board minutes are unclear regarding whether the license was taken by the Board in July 2008 or January of 2009. For purposes of this appeal, it makes no difference.

determine, according to Chairman Everhart, "who has the license and what's going on." Turner stated that O'Brien had not paid the rent or the taxes[7] and that she had changed the locks on the premises. Turner's attorney told the Board that because O'Brien defaulted on the sublease, the business belonged to the Turners. *See* p. 566, 23 A.3d at 325, *supra*. O'Brien responded that he had no intention of transferring the license to Turner and still wanted to move the license out of the neighborhood.

Chairman Everhart told O'Brien:

[If] you want to make an application for a transfer, we can certainly do that. It is your license. So if that's what you want to do, you can make an application to transfer it and I want to say up front that we don't guarantee transfers ... The problem you have between the two of you, we don't ... I don't see any involvement we have in that.

Turner's attorney asked: "[C]an the license be transferred over the objection of the resident agent?" The Chairman responded: "If the license can be transferred, yes, because it is his license." Another commissioner made a motion that "O'Brien may apply for a transfer," but that before any approval, Turner may assert her "full legal rights." The motion was approved unanimously.

What happened next is a little unclear. In his filings in this case, O'Brien said that he delivered the transfer application to the Board on Monday, March 2, 2009 and was told by Board Administrator Deborah L. Kirk that "there would not be any transfers in the month of March and subsequently in the month of April of 2009." Kirk was alleged to have said that "there are no transfers in March as it is the renewal month, and that April will be violations hearings." The transfer application was not included in the record in the circuit court or the record in this Court. At oral argument in this Court, the Board's counsel said that the Board had no record of receiving a transfer application.

---

7. Turner herself paid the taxes.

Apparently acting as if it had not received the transfer application, the Board met two more times with the parties in this controversy. On both occasions the issue described in Board minutes was "LICENSE RENEWAL." At the March 18, 2009 meeting, the following exchanges occurred:

Chairman Everhart: The question that you came here for ... would you explain what your requesting is (*sic*).

Adam Obrien: Requesting to be approved to renew the license and move forward with the transfer without Sharon Turner's signature.

Chairman Everhart: Well, you can't move forward with the transfer. You can move forward with renewing your license. You'll have to renew the license before you transfer it anyhow, so it's not gonna affect you if you don't transfer. But that wouldn't affect the, you know, you, as far as you getting the license. What do you have to say about ... where do you all stand on this license? Do you have anything else you'd like to say?

Adam Obrien: Not at this time.

Chairman Everhart: Do you have anything?

Sharon Turner: I'm not gonna sign off on the license. I had gotten a letter from them stating that they would pay me in February 6 of 2011. Absolutely, not. I don't want this tied up for that long. I'm not gonna do it and they sent me a thing of release. I'm not signing anything. If he wants the license, pay me what you owe me. If he wants to go back in that building, I will hand him back the key, but why am I gonna release him or want him to get his license. He doesn't pay his rent. That's back. The taxes are not paid. I've paid them. And I think that you guys need to step in here, either give me the opportunity to apply for this license myself, without him, because he is in default and I had the attorney here before. You guys know if I have to take this to court, I'll do so.

After Michael Turner indicated that he would not reopen the property until the back rent and other payments were made, the Chairman said:

Well let me ... I'll say this, actually, and we've talked about this and we're not ... We will allow the new license to be applied for. We will not allow for her (Sharon Turner) to come off of that or will not allow it to be transferred. If it's gonna be transferred, it'll be done at a later time. But you could make your application for the license the way the license exists, as long as you meet some of the criteria that you have to meet. To even renew your license there's some issues that have to be taken care of and you'll find that out when you make your application, if you haven't already. There's things on there that has to be taken care of....

When Sharon Turner asked what would happen if O'Brien did not file a renewal application by April 1st, the Chairman replied: "[T]here won't be [any] license then. He won't have a license April 1st."

One week later, the principal contestants were back before the Board. At this March 25, 2009 meeting, the following colloquy took place:

Chairman Everhart: Do they need landlord's signature to renew? That's why you're here today, correct? Is that all? Nothing about transferring?

Adam Obrien: No. I want to request that Sharon Turner's name be taken off my liquor license.

Chairman Everhart: Okay. The way the law reads is, the fact the lease is up in August, so, consequently, you cannot take her off because, actually, if the lease was for the following year or five years and extend the lease that you have, then you would not need to have someone sign it. The fact that the lease is not for that extended period of time, the person that is on there now is the person that's gonna be there until the lease is over. And at that time you could possibly change the names and that's why that is.

Adam Obrien: Alright.

Chairman Everhart: So, I hope you understand that. But that's the reason it is the way it is. If the lease was for a year then that would be okay. You could take her off.

But the fact it's only until August, it's not for the year, and the license [is] issued for a year and we cannot issue the license for a 4 month period of time or with someone else's signature. Any questions?

Alan Greenwald: I'd just like to try and understand precisely where the conflict is because there ...

Chairman Everhart: Let me say this. I'll tell you where the conflict is. It is the law. The law specifically states that the lease has to be for the year and that you're gonna have the license. The lease has to be to the following April at least or any extended period after that. It could be a 5 year lease. But the fact the lease is only good until August that you all have now, the existing lease .... we can't issue a license for a year for a lease that's only good for 4 months or well actually, I hope you understand that is the law.

Greenwald, who now held a power of attorney in connection with DeCourcy's Pub, LLC, argued that Turner did not have a sublease because the governing document was a "sales agreement." *See* p. 566, 23 A.3d at 325, *supra.*

Later, Chairman Everhart told O'Brien:

Well, like I say, the only thing is, in all fairness, the only thing we are telling ... The fact that she will be on until August and then you can, and we are gonna allow you to renew the license, even though technically you're not gonna be using them [*sic*] until you do transfer them I guess. I don't know what your intent is now, but it doesn't matter. We are gonna allow you to renew the license so that's something that's gonna be in your favor.

However, the Chairman was less optimistic when Greenwald made it clear that the pub wanted to renew without Turner's signature:

Chairman Everhart: We're gonna renew the application the same as it was before.

Alan Greenwald: Okay, with? If Mrs. Turner refuses to sign it, will you renew it?

Chairman Everhart: Well, I didn't know you wasn't gonna be signing it.

Sharon Turner: I'm not signing it until I get some money. They owe me money and I'm not signing it.

Eventually, Chairman Everhart advised the parties:

We're not gonna argue what's gonna happen or not happen. We're telling you that if you want to renew that license, our advice would be for you to renew it and she's gonna have to sign for you to renew it. It will be good until August and if you decide to stay there or even if you want to transfer the license, but you won't have a license to transfer if you don't renew the license, okay? Remember that. The other thing being, if you should decide do you even want to stay there, at the end of August you would have to have the approval of the owner of the building at that time or whoever you leased it to at that time to go over the same thing that you're doing now.

O'Brien and Turner were unable to agree and no renewal application was filed by April 1, 2009. On May 27, 2009, more than two months after the March 25th meeting, O'Brien and DeCourcy's Pub LLC filed suit against the Board in the circuit court. The *pro se* action was labeled both a "Petition for Judicial Review" at the top of the page and a "Petition of Writ of Administrative Mandamus" at the bottom. The filing also prayed for injunctive relief.[8] O'Brien contended that the Board violated "[a]dministrative [d]uties required by law," that its decision "not to act in a timely manner" to transfer the license was arbitrary, capricious, "a prejudicial abuse of authority" and an "unconstitutional deprivation of property." He also asserted that the Board "misapplied the law and its own regulations," because the licensee was "entitled to a fair transfer and renewal hearing" before the license was "dissolved." O'Brien prayed for an "injunction ordering the immediate [t]ransfer and [r]enewal" of the license and an "in-

---

8. The verified complaint was docketed by the clerk as a Petition for Judicial Review.

junction ordering the immediate removal" of Turner's name off the license. O'Brien also requested the Board to continue to "hold" the license until the conclusion of this litigation and the Board agreed, even though a motion to stay its decision had been denied.

The parties skirmished over the inclusion in the record of a transcript of the July 9, 2008 Board meeting, whose minutes were not provided to O'Brien until after the conclusion of the circuit court proceedings, but were included in the record on appeal without objection by the Board.[9] The circuit court initially declined to grant the Board's motion to "deny" the petition for administrative mandamus. O'Brien moved for summary judgement and the Board orally moved to dismiss at a September 25, 2009 hearing.

On October 13, 2009, the circuit court denied the petition for administrative mandamus. In its opinion, the court described the Board's March 25, 2009 meeting as "advisory in nature" and concluded that the Board "never issued a final order denying renewal of the license." It said that the petition for administrative mandamus was "premature in that the issues involved have never been resolved." The court said: "This Court can neither order the Board to make Ms. Turner sign off on the renewal application nor order Ms. Turner to sign off. It is not the proper forum." In addition, the court said that the action was untimely under the Maryland Rules because it was not filed within 30 days of the Board's March 25, 2009 hearing.

Finally, the court said:

[T]he license in question lapsed on or about March 30, 2009, without any formal action taken by the Board. Without the Petitioner—Turner issue resolved, the license's status became jeopardized and lapsed. State law requires that a renewal application be accompanied by a statement signed by the owner of the premises consenting to renewal of the

---

**9.** The minutes of the other five meetings were transmitted to the circuit court by the Board.

license. See Art. 2B, § 10–301(ii)(2) of the Alcoholic Beverages Section of the Annotated Code of Maryland. Further, State law requires a minimum one-year lease for renewal. See Art. 2B, § 10–301(ii)(3) of the Alcoholic Beverages Section of the Annotated Code of Maryland. Without the resolution of the condition precedent, i.e. the lease issue, the Board's hands were tied. The issue for all intents and purposes is moot. It is important to note that Petitioner addressed both the renewal and transfer of the license in his Petition and at the hearing; however it is clear under the law that the transfer of a license cannot occur until the renewal of the license occurs, and therefore we must only address the renewal of the license.

Subsequently, O'Brien filed a motion to alter or amend, which was denied. This appeal followed, in which O'Brien is represented by counsel.[10]

## QUESTIONS PRESENTED

I. Did the trial court err in dismissing the petitioners' petition for administrative mandamus and in not compelling the respondent to comply with and adhere to its own rules and regulations regarding the petitioners' application for transfer?

II. Did the trial court err in denying and dismissing the petitioners' petition for administrative mandamus without the benefit of a complete and accurate record of the proceedings below when the respondent failed and refused to timely process the petitioners' timely filed application for transfer so as to deny the petitioners' due process of law with regards to their liquor license transfer rights rendering these actions arbitrary and capricious?

---

**10.** Prior to briefing and argument in this Court, appellants sought a writ of certiorari in the Court of Appeals, which was denied. *Decourcy's Pub v. License Comm'rs.*, 411 Md. 741, 985 A.2d 539 (2009).

III. Did the trial court err in docketing this action as an administrative appeal rather than as an administrative mandamus action?

The Board has also filed in this Court a motion to dismiss O'Brien's appeal, thus raising these questions:

I. Is this appeal allowed by the Maryland Rules and State law?

II. Should this appeal be dismissed for failure to comply with procedural requirements of the Maryland Rules?

III. Should this appeal be dismissed as moot?

## DISCUSSION

### I. Motion to Dismiss Appeal

The Board has launched a multi-pronged attack on O'Brien's right to pursue this appeal. It contends that: 1) O'Brien cannot prove that the Board inflicted injury to his legally protected rights, acted arbitrarily and capriciously or without substantive evidence; 2) there is no final order of the Board from which judicial review could have been sought; 3) O'Brien seeks review of issues not presented at the administrative level; 4) mandamus is not an available remedy; 5) the contents of the record and record extract do not comply with the requirements of the Maryland Rules; and 6) the case has become moot because the license has expired.

In our view, a number of these contentions spill over into the merits of the case; others may be grounds to affirm, but not to dismiss the appeal; and the procedural objections are insufficient grounds for dismissal.[11] The mootness issue—turning on whether the license has expired—is also colored by the merits of the appeal and is undercut to some degree by

11. The Board argues that a certified copy of the docket entries is not found in the record in violation of Md. Rule 8–413(a). The record shows that this is simply incorrect. Although O'Brien did not include a copy of the docket entries in his record extract, or a table of contents or filing dates of exhibits, these deficiencies are not of sufficient magnitude to prevent us from reaching the issues O'Brien has raised.

the Board's acquiescence in putting the license "on hold" until the conclusion of this litigation.[12]   For these reasons, we deny the Board's motion to dismiss this appeal.

## II.   Denial of Writ of Mandamus

To sort out the issues on this appeal, we need to narrow our focus on the precise nature of O'Brien's hybrid claims and the statutory provisions and Board rules that affect the outcome.

### A.   What is the nature of O'Brien's claims?

At the outset, it is important to note the key difference between: (1) an action or complaint for administrative mandamus and a petition for judicial review of agency action;  and (2) administrative mandamus and traditional mandamus.   A petition for judicial review under Title 7, Chapter 200 of the Maryland Rules is authorized when judicial review of an "order or action" of an agency is authorized by statute.   Md. Rule 7–201(a).   On the other hand, an administrative mandamus action is authorized to review a "quasi-judicial order or action" of an agency when review "is not expressly authorized by law."   Md. Rule 7–401(a).[13]   The procedure for an action

---

12.   One possible ground for a finding of mootness might have been premised on § 10–504(a) of Article 2B, which states:

> Except in Baltimore County, on the tenth day after the holder of any license issued under this article has vacated, or been evicted from the premises for which the license was issued, the license shall expire unless an application for approval of a transfer to another location or assignment to another person pursuant to § 10–504 of this article or an application pursuant to § 10–506 of this article has been approved or is then pending.   However, the State Comptroller or local licensing board, as the case may be, may postpone the expiration for an additional period not exceeding 20 days in any case to avoid undue hardship.

It appears from the record, that at least by January 2009, O'Brien had vacated or was evicted from the premises for which the license was issued, that no application for transfer was then pending and that the Board had not postponed expiration for undue hardship.   However, because no party has argued or briefed the application of § 10–504(a), we will not *sua sponte* address mootness on this ground.

13.   Although the term, "administrative mandamus" is relatively new in Maryland law, the Court of Appeals in *Talbot County v. Miles Point*

for administrative mandamus mirrors those governing a petition for judicial review.

■ A traditional mandamus action is of common law origin, but has been regulated in significant respects by the General Assembly.[14] Among its many functions are compelling the performance of a ministerial duty by a public officer, *see Talbot County v. Miles Point Prop., LLC, et al.,* 415 Md. 372, 396–97, 2 A.3d 344 (2010), and enforcing the regulations of an administrative agency. *See* 52 Am.Jur.2d *Mandamus,* § 124. In this sense, traditional mandamus has much in common with a mandatory injunction, which O'Brien's petition

---

*Prop., LLC,* 415 Md. 372, 394, 2 A.3d 344 (2010), indicated that the roots of the remedy go back to *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73 (1945) (State courts have the inherent power to review arbitrary, illegal or capricious agency actions.) A call for reform in this area arose shortly after the Court of Appeals decision in *Board of License Comm'rs. v. Corridor Wine,* 361 Md. 403, 761 A.2d 916 (2000), which wrestled with the question of which, if any, non-statutory mechanism for judicial review was available to challenge an interlocutory action of a liquor board. *See* Opinion: Mandamus and Certiorari: We need new rules, *Maryland Daily Record,* (Jan. 10, 2001) at 1C. This was followed by a recommendation by lawyer, legal writer and *Daily Record* Editorial Board member, Jack L.B. Gohn for wide-ranging reforms of the mandamus and certiorari rules. The proposal had a long gestation period in the Specific Remedies Subcommittee of the Rules Committee, where the original proposal was scaled back. In April of 2003, draft rules were submitted to the full Committee, which remanded them back to the subcommittee for more work. Finally, the present rules were approved by the Court of Appeals on November 8, 2005, to take effect January 1, 2006. Files of the Rules Committee indicate that the term "administrative mandamus" was taken from California law, without any intent to incorporate that state's elaborate caselaw on its version of this remedy.

14. The first mention of mandamus in a reported Maryland case was in 1709 in a decision of the Provincial Court. *Bordley v. Lloyd,* 1 H. & McH. 27 (1709). The common law remedy was also shaped by legislation. *See* 9 Anne C. 20 (1711); Chapter 90, *Laws of 1806;* Chapter 78, *Laws of 1828;* Chapter 285, *Laws of 1858.* At one time, a whole article of the Maryland Code was devoted to mandamus—Article 60. In 1962, most of these provisions were repealed with the intention that mandamus would be governed by the Maryland Rules of Procedure. *See* chapter 36, *Laws of 1962.* The present provisions on mandamus are found in Maryland Rule 15–701. The remaining and often overlooked statutory provisions are found in Md.Code (1973, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 3–8B–01 and § 3–8B–02.

also expressly sought.[15]

The distinctions between these causes of action are particularly relevant in a hybrid action such as this one. For example, if all or a portion of O'Brien's case was a petition for judicial review or an action for administrative mandamus, a litigant would generally be required to go to court within 30 days of the agency order or action. Md. Rule 7–203(a) and Md. Rule 7–402(a). This clearly did not occur here. On the other hand, it is unlikely an action for traditional mandamus or mandatory injunction would have had to meet such a severe limitations period.[16] In addition, in a proper case, traditional mandamus may be invoked to compel a board to consider a license application, although it ordinarily may not be used to require the granting of the license.[17] It is also possible for traditional mandamus to be a remedy even when the agency's

---

**15.** In 1994, a proposal came before the Rules Committee to abolish mandamus and replace it with a petition for injunction. The suggested change was based in part on the 1937 action of the U.S. Supreme Court, which sought in Federal Rule 81(b) to abolish mandamus—a decision reversed in part by Congress's enactment in 1962 of the Federal Mandamus and Venue Act, 28 USC § 1361. After opposition to the 1994 recommendation by the Administrative Law Section of the Maryland State Bar Association, the proposed Maryland rule change was shelved.

**16.** Although it is unclear whether a general statute of limitations is applicable to a traditional mandamus action, *see George's Creek Coal & Iron Co. v. Allegany County Comm'rs.*, 59 Md. 255, 262 (1883), laches clearly may be raised as a defense. *See e.g., Ipes v. Board of Fire Comm'rs.*, 224 Md. 180, 167 A.2d 337 (1961). Laches may also be raised in an injunction action. *See Schaeffer v. Anne Arundel County*, 338 Md. 75, 81–83, 656 A.2d 751 (1995).

**17.** According to 52 Am.Jur.2d, *Mandamus* (2000), § 202:
One who has applied for a transfer of a liquor license held by another may invoke the writ to compel a hearing on his application, but discretionary action of an officer or board with respect to the approval or disapproval of a transfer of ownership or of location of a liquor license is not reviewable by mandamus where there is no showing of arbitrary action or abuse of discretion.
*See also Board of County Comm'rs. v. Buch*, 190 Md. 394, 402, 58 A.2d 672 (1948) (Mandamus may be issued to compel a hearing or to come to a decision.)

action is not quasi-judicial; but this is not the case under the administrative mandamus rules. *Talbot County,* 415 Md. at 394–95.

■ With this background in mind, we will attempt to parse O'Brien's complaint and to place each component in the appropriate category. The "refusal" of the Board to approve the transfer of a license is judicially reviewable *by statute, viz.,* § 16–101(a) of Article 2B.[18] *See Baltimore County Licensed Bev. Ass'n. v. Kwon,* 135 Md.App. 178, 185, 761 A.2d 1027 (2000). Thus, to the extent O'Brien seeks to contest the Board's refusal to approve the transfer of his license, this contention is governed by the rules governing a petition for judicial review, including their timeliness requirements.[19] Because a statute authorizes judicial review, administrative mandamus is not available on this issue.[20]

■ O'Brien's contention that the Board erred in not *considering* his transfer application stands on a different footing. If the Board had no discretion to decline to address the issue, O'Brien might have been entitled to traditional mandamus relief. This would also be true of the contention that the Board failed to "timely" consider the transfer request, if the Board was mandated by law or rule to consider the matter within a certain time frame.[21]

---

**18.** Section 16–101(a) states: "The decision of a local licensing board, in approving, suspending, revoking and restricting or refusing to approve, suspend, revoke or restore a license, or a licensee, shall be subject to appeal in the manner provided in this section."

**19.** This also would have been true of the Board's "refusal" to issue a renewal license. This was an issue presented before the Board and in the circuit court, but not in this Court. In any event, for reasons stated at n. 26, *infra,* the Board did not err in not renewing O'Brien's license.

**20.** Because we conclude that administrative mandamus is not an available remedy here, we need not reach the troublesome issue of whether the action of the Board with respect to O'Brien's licensing request was "quasi-judicial." Although witnesses were sworn in at board meetings, the one held on March 25, 2009 appeared at times to be an informational meeting, rather than an adversary hearing with examination/cross-examination and the building of a record.

**21.** The last component of O'Brien's petition in the circuit court was a request for a mandatory injunction. The apparent rejection of this

## B. Statutory Provisions and Board Rules

Turning to the only claims of O'Brien that are not time-barred, we note their viability turns on a proper reading of Board rules and the statutory provisions underlying them. In essence, would the rules and statutory provisions have required the Board to consider and rule on O'Brien's transfer application before his license expired?

Under § 10–206(a) of Article 2B, O'Brien's license was set to expire on April 30, 2009. To obtain a transfer, he had to meet the same requirements for the granting of a new license. Art. 2B, § 10–503(a)(2)(iv). Under Board rules, all applicants for a license (including transfer applicants) have to appear in person before the Board (which met on Wednesdays) at the time the application is made. BLC–005. A notice of the application was required to be published two times in two successive weeks and a hearing—which the Board referred to as the final hearing—had to occur "not less than seven nor more than 30 days after the last publication." Art. 2B, § 10–202(a). State law sets no deadline for Board action on the transfer application.[22]

Of particular relevance to this case are Board Rules BLC–007 (Transfer Application) and BLC–006 (Renewal Application). BLC–007(a) states: "Due to the renewal process each year, no application for transfer will be accepted after the first

---

claim by the court is not challenged in appellants' brief. Thus, the issue is not before us. Even if it were, aside from a failure to demonstrate the elements of an injunction, O'Brien would have faced formidable hurdles in obtaining an injunction. An injunction ordering transfer of the license would be duplicative or precluded by the remedy set forth in § 16–101(a) of Article 2B. *See McCully v. Radack*, 27 Md.App. 350, 361, 340 A.2d 374 (1975); and *Buch, supra*, 190 Md. at 402, 58 A.2d 672.

**22.** The Board's website, of which we take judicial notice, is more explicit about timeframes. The Procedure for Filing an Application set forth in *www.wcliquor_bd.org./instructions.shtm* states than an applicant "shall" present his or her application on a Wednesday morning; then the final hearing is "usually" scheduled for the third Wednesday after presentation; and that [t]he application process takes approximately 30 days from application to finalization."

Thursday in March to become effective prior to May 1st." Subsection (d) goes on to provide: "All obligations of the transfer (for licenses) contracted in connection with the business must be fully paid, or some arrangements concerning such debts and obligations, satisfied with his creditors, have been made." BLC–006 provides:

(a) Application for renewal of alcoholic beverages license must be filed with the Board of License Commissioners for Washington County at least thirty (30) days prior to expiration of present license. Application filed April 2nd through April 11th shall be subject to a penalty of $100. Application filed on April 12th or thereafter shall be subject to a penalty of $400. [Article 2B, Section 10–301(*o* )].

(b) *No revision in licensees, classification, location, etc may be processed on a renewal application. All such revisions or application for transfer must be finalized by April 1st or after May 1st renewal has been issue[d].* However, if the Board finds that the license holder is not qualified to obtain renewal of the existing class or type of license, they shall issue to him, by way of renewal, the class or type of license for which they find him qualified. If an expiring license is subject to any order of restriction or suspension, the new license shall be issued subject to said order.

(c) All State (Retail Sales, Employee Withholding, Amusement, and Admission) Municipal and County taxes must be paid before renewal license is issued.

(emphasis added).

## C. Was O'Brien entitled to Traditional Mandamus Relief?

O'Brien's mandamus claim rises and falls on the basis of these rules of the Board. He asserts that he delivered the transfer application to the Board on Monday, March 2, 2009— three days before the first Thursday in March, the deadline

established by BLC–007(a).[23] He appears to argue that once that process has been triggered, if the two week period for publication of the notice of application is added to the 7–30 day period that precedes the public hearing, there would have still been time for the transfer to be approved before the April 30, 2009 date for the expiration of the license.

■ There are three major problems with this hypothetical. First, under BLC–005, O'Brien was required to have an in-person presentation hearing on a Wednesday when the Board sat. Because there is no evidence this occurred, the process was never appropriately triggered.[24] Second, BLC–006 requires an application for transfer to a new location to be "finalized by April 1st or after [the] May 1st renewal has been issue[d]." There was no likelihood that the transfer application could be finalized in that brief window.[25] More importantly, there was no clear legal duty for the Board to finalize the transfer by April 1, 2009, because it had the discretion to set the final hearing up to 30 days after the last publication of the notice of application. Also, O'Brien could not have taken advantage of the May 1st date specified in BLC–008, because that date is keyed to renewing the license—an action O'Brien failed to take.[26] Third, the Board was not under a clear legal duty to consider or approve the transfer where O'Brien had

---

23. The only evidence in the record that O'Brien delivered the application was a statement to that effect in his verified complaint. The Board offered no evidence to counter this assertion.

24. It is true that on July 9, 2008, O'Brien and Greenwald discussed the proposed transfer with the Board, which appeared to be agreeable to the filing of the application. However, no application was filed at that time and a new LLC that would have been on the license had not been formed.

25. Perhaps, one of the reasons O'Brien filed his application on a Monday, instead of a Wednesday, is because the later filing would have not have resulted in a 30–day window.

26. Although he challenged the failure to renew in the circuit court, O'Brien has not made that contention here. Even if the issue were preserved, we see no error in the Board's insistence that Sharon Turner or William Martin as owners of the premises, sign on the renewal in accordance with § 10–301(a)(ii)3 of Art. 2B. This paragraph states:

not satisfied his debts and obligations with his creditors as required by BLC–007(d). As far as this record is concerned, the evidence shows that the licensee had not satisfied his monetary obligations to Turner. In addition, the Board would have had to address the issue of whether the Turners now owned the license as a result of O'Brien's defaults. *See* pp. 566, 23 A.3d at 325 and 568–69, 23 A.3d at 326–27, *supra.* In short, the swift transfer of the license was not guaranteed.

■ For these reasons, we conclude that O'Brien has not shown that he was entitled to a mandamus to require the Board to consider his transfer application prior to its expiration on April 30, 2009.[27]

### III. Remaining Issues

O'Brien raises two additional questions which, in our view, have no merit.

---

> In the case of retail dealers applying for renewal, the statement of consent by the owner of the premises may not be required if the owner has previously signed such a statement in connection with an original application or previous renewal application giving consent for the term of the owner's lease with the applicant *if the lease or renewal does not expire during the term of the renewal license.*

(Emphasis added). Because the lease/sublease agreement was set to expire in August of 2009 during the term of the renewal license, such consent was required here. O'Brien's belated attack on the validity of the sublease gets him nowhere. If the sublease were not valid, he would not have been entitled to a license in the first place.

27. O'Brien, who had six meetings with the Board, does not advance his cause by packaging his claim as a due process violation. Under Maryland law, he had no vested property right in his license. Art. 2B, § 10–501(a) ("Except as otherwise provided under this section, licenses issued under provisions of this article shall not be regarded as property or as conferring any property rights. All such licenses shall be subject to ... all rules and regulations that may be adopted as herein provided.") *See also Dodds v. Shamer,* 339 Md. 540, 547, 663 A.2d 1318 (1995) ("[A] liquor licensee possesses no constitutionally protected property right that would restrict the State or the State authorized licensing authority from exercising its plenary power over the licensee.") State law authorizes Board rules to restrict the grant or denial of an application. Even if O'Brien had a property right in the license flowing from State law, *see Orgain v. City of Salisbury,* 521 F.Supp.2d 465, 478, n. 39 (D.Md.2007), he was not free to ignore Board rules in asserting or maintaining that right.

## A. Defects in Administrative Record

Appellants' primary complaint is that the transcript of the July 9, 2008 meeting of the Board was not available to or considered by the circuit court. Those minutes have been included in the record of the appeal. We have examined them and do not see how they would have changed the result in the circuit court. While Board members at the July 9, 2008 meeting seemed agreeable to O'Brien's *filing* of a transfer application, nothing indicates that this is tantamount to *approval* of the application. In our view, the record was sufficiently complete for the circuit court and this Court to decide all the issues O'Brien has presented.

## B. Docketing as a Petition for Judicial Review

O'Brien also argues that the Clerk of Court erred in docketing this action as a petition for judicial review rather than an action for administrative mandamus. If the filing was erroneously docketed, O'Brien shares the blame because he captioned his complaint as a Petition for Judicial Review. *See* pp. 573–74, , 23 A.3d at 329–30, *supra.* Moreover, because the procedure for handling such a petition and an action for administrative mandamus are virtually identical, we fail to see how O'Brien has been harmed. Finally, his filing, whether treated as either of these causes of action, was untimely.

For all of these reasons, we affirm the decision of the circuit court.

**JUDGMENT AFFIRMED. COSTS TO BE PAID THREE–FOURTHS BY APPELLANTS AND ONE–FOURTH BY APPELLEE.**