REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 599

September Term, 2013

MAYOR AND COUNCIL OF ROCKVILLE,
ET AL.

v.

WILLIAM A. PUMPHREY, ET AL.

Eyler, Deborah S.,
Wright,
Rodowsky, Lawrence F.
        (Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah S., J.

Filed: July 31, 2014

Woodward, J., did not participate in the argument
or the decision in this case.

This appeal arises from two actions for judicial review filed in the Circuit Court for Montgomery County. In each case, William Pumphrey, on behalf of the Robert A. Pumphrey Funeral Home, and RAP Leasing Corporation ("RAP") (collectively "Pumphrey"), the appellees, were the petitioners. In the first action for judicial review, Pumphrey challenged a text amendment to the City of Rockville's zoning ordinance enacted by the Mayor and City Council of Rockville ("Mayor and Council" or "the City"), an appellant, which eliminated language permitting the expansion of off-street parking for certain nonconforming uses within Rockville ("the text amendment case"). Pumphrey alternatively sought mandamus relief against the City. In the second action, Pumphrey challenged a decision of the City of Rockville Planning Commission ("the Planning Commission"), an appellant, denying his final record plat application for the consolidation of two adjacent parcels into one lot ("the plat case").

The circuit court denied the City's motion to dismiss the text amendment case, granted Pumphrey's motion to consolidate the two actions, heard argument, and ruled that the text amendment to the zoning ordinance was invalid because the City acted arbitrarily and capriciously in enacting it. The circuit court further ruled that the Planning Commission's decision to deny Pumphrey's final record plat application was arbitrary, capricious, and unsupported by substantial evidence in the record. The circuit court reversed and vacated the text amendment enacted by the City; ordered a prior text amendment to be reinstated; and reversed the Planning's Commission's order denying the final plat application.

On appeal, the City and the Planning Commission present four questions for review, which we have rephrased:

I.     Did the circuit court err by concluding that the enactment of the text amendment was a quasi-judicial act, and not a purely legislative act, and in denying the City's motion to dismiss on that basis?

II.    Did the circuit court err by reversing the decision of the Planning Commission in the plat case?

III.   If the Planning Commission erred, was the circuit court obligated to remand the plat case to the Planning Commission for further proceedings?

IV.    Did the circuit court err or abuse its discretion by consolidating the text amendment case and the plat case?

For the reasons to follow, we conclude that the circuit court erred by denying the City's motion to dismiss the text amendment case and by reversing the decision of the Planning Commission in the plat case. We shall vacate the circuit court judgment and remand with instructions that it enter orders dismissing the text amendment case and affirming the decision of the Planning Commission. Our resolution of these first two issues obviates the need to address the third and fourth issues.

## FACTS AND PROCEEDINGS

Since 1930, the Robert A. Pumphrey Funeral Home, f/k/a Pumphrey's Colonial Funeral Home ("Funeral Home"), a family-run business, has operated out of a three-story house located at the corner of West Montgomery Avenue and Williams Street in the West End neighborhood of Rockville.[1]  The Funeral Home's address is 300 West Montgomery

---

[1]The house was built in 1900. It replaced the Kellogg Mansion, which had been built in 1888 and was destroyed by fire in 1898. Before the Pumphrey family purchased the house, it had been occupied by a country club.

Avenue and it fronts on that road. In 1977, RAP, a corporate entity owned and operated by the Pumphrey family, purchased the property.

The lot next door, 304 West Montgomery Avenue ("the adjoining parcel"), was purchased by the Pumphrey family in 1961. At that time, it was improved with a large house. The house was demolished in 1970. Since then, the adjoining parcel has been open lawn with a perimeter of screening vegetation between it and a neighboring residential property at 306 West Montgomery Avenue. RAP also is the record owner of 304 West Montgomery Avenue.

The Funeral Home has been a nonconforming use since August 3, 1932, when the first zoning ordinance governing the property was adopted. Presently, it and the adjoining parcel are zoned R-90 HD, Single Unit Detached Dwelling Restricted Residential, Historic District.

The Funeral Home has 17 off-street parking spaces available for visitors, all of which are located in its backyard. Two of the spaces are enclosed in a one-story garage. The other 15 spaces are on an open, paved lot. Access to the parking lot is from a driveway off of Williams Street. When, as is often the case, the parking lot is full, visitors park on Williams Street and other nearby residential streets. For some time, this practice has resulted in complaints from neighbors.

### A. The 2010 Text Amendment

In 2010, Pumphrey began to investigate expanding the existing parking lot for the Funeral Home onto the adjoining parcel. City officials informed him that the zoning ordinance prohibited the expansion of nonconforming uses except in very limited

3

circumstances not applicable to the expansion of a parking lot. City officials also informed Pumphrey that he could pursue a text amendment to the zoning ordinance to permit such an expansion.

At all relevant times, the City's zoning ordinance ("the Ordinance"), which is codified at Chapter 25 of the Rockville City Code ("RCC"), and Md. Code (1957, 2010 Repl. Vol.), Article 66B ("art. 66B"),[2] governed the procedure for text amendments. As pertinent here, section 25.06.02 provides that "any interested person or governmental agency" may file "[a]n application for an amendment to the text of [the Ordinance]." RCC § 25.06.02.b.1. The application must be submitted to the City Clerk on a form provided by the City's Chief of Planning and be accompanied by a filing fee as determined by the Mayor and Council. RCC § 25.06.02.b.2. The City Clerk must transmit the proposed text amendment to the Planning Commission within five days of receipt of an application. RCC § 25.06.02.d.1. The Planning Commission "may submit a written recommendation to the Mayor and Council." *Id.* If it does so, its recommendation becomes part of the record upon the Mayor and Council's consideration of the text amendment. *Id*.

An application for a text amendment may not be granted unless a public hearing is held by the Mayor and Council. RCC § 25.06.02.f.; art. 66B, § 5.03(c)(1) (before a local legislative body may adopt a regulation, it must hold a public hearing). Before such a

_____

[2]Effective October 1, 2012, article 66B was repealed by the General Assembly and recodified, largely without substantive change, in the Land Use Article ("LU"). *See* Acts of 2012, ch. 426, § 2.

hearing, notice of the proposed amendment must be published in "a newspaper of general circulation." RCC § 25.06.02.c; art. 66B, § 5.03(c)(2). After notice and a public hearing, the Mayor and Council may grant a text amendment "by ordinance" or may deny, dismiss, or allow the withdrawal of the text amendment. RCC § 25.06.02.g.1.

On June 24, 2010, in accordance with these provisions, Pumphrey filed with the City's Department of Community Planning and Development Services ("Department of Planning") an "Application for Text Amendment" ("the 2010 Application"), with a $3,000 application fee. The 2010 Application was designated TXT2010-00228 by the City Clerk.

The application sought to amend "[e]xisting [t]ext" to "allow expansion of parking of a long standing nonconforming use in a single dwelling unit residential zone." Specifically, Pumphrey sought to amend Section 25.08.05 of Article 8 of the Ordinance, which governs nonconforming uses in Single Dwelling Unit Residential Zones, to add a new subsection "d." As proposed by Pumphrey, the new subsection would read:

> Additional Off-Street Parking - Where a nonconforming use in a Single Dwelling Unit Residential Zone has been in continual existence on a lot since prior to August 3, 1932, off-street parking for the nonconforming use may be altered, expanded, or enlarged on the lot and/or on an adjacent lot in accordance with the requirements of Article 16 and the Landscaping, Screening and Lighting Manual.

The 2010 Application was forwarded to the Planning Commission for review. On September 17, 2010, the Chief of Planning filed a staff report recommending that the Planning Commission recommend denial of the 2010 Application for two reasons: 1) a general policy against expansion of nonconforming uses and 2) potential adverse impacts on

5

adjoining residential properties. The staff report explained that the purpose of the proposed amendment was to "facilitate the continuation of the nonconforming use [of the Funeral Home] by expanding the off-street parking onto the adjoining lot at 304 West Montgomery Avenue," which, it noted, would bring the nonconforming use into closer conformity with development standards by adding 32 off-street parking spaces. Alternatively, the staff report recommended revision of the proposed text amendment to limit its applicability to nonconforming uses in the R-90 zone that were in existence in 1932, when the City first adopted a zoning ordinance. The staff report emphasized that Pumphrey would be required to consolidate its two properties so that the parking was on the same lot as the use being served.

The Planning Commission considered the 2010 Application at a meeting on September 29, 2010, and voted three to two to recommend to the City and Council that the text amendment be denied. The Historic District Commission ("HDC") conducted a courtesy review of the 2010 Application and also voted to recommend that it be denied.

On October 25, 2010, the Mayor and Council convened for a public hearing on the 2010 Application. The Zoning Administrator introduced the proposed text amendment, explaining that its purpose was to "allow for the expansion of [off] street parking in connection with a [non]conforming use in existence before August 3, 1932," which, he noted, was "a funeral home located at 300 West Montgomery Avenue." He informed the Mayor and Council that the Planning Commission and the HDC had recommended denial of the text amendment. He took questions. Council members asked for some general

6

information about nonconforming uses and about what would happen to the Funeral Home if the text amendment were denied. They also asked what would happen if the Funeral Home were sold or ceased operation. The Zoning Administrator explained that, under the Ordinance in its then current form, if a nonconforming use ceased for a period of three months or more, it would lose its status as a lawful nonconforming use. Moreover, if the Pumphrey family were to sell the 300 West Montgomery Street property and the new owners did not wish to continue the funeral home use, the property would revert to a residential use.

With respect to the effect of the proposed text amendment, the Zoning Administrator described it as being "fairly general" and opined that there could be a "few other nonconforming uses elsewhere in the city" that the change might affect. This was why the staff report had recommended "tightening the language up" to include only nonconforming uses in existence since 1932 in an R-90 zone. According to the Zoning Administrator, if the proposed text amendment were altered in that way, it would apply only to the Funeral Home.

Following the presentation by the Zoning Administrator, individuals and representatives of organizations were allowed to speak. Pumphrey's lawyer spoke first. She stated that the proposed text amendment was designed to allow the Funeral Home to expand its parking lot onto the adjoining parcel to alleviate on-street parking congestion on Williams Street. She explained that the text amendment was drafted narrowly, so as not to affect other properties, and that Pumphrey did not object to the even more narrow language proposed by the planning staff. She asked the Mayor and Council not to be swayed by those who were arguing that this was a "black and white" issue of expansion of a nonconforming use. She

7

urged them to consider that the Funeral Home was both a nonconforming use and a community landmark. She also asked the Mayor and Council to consider the impact on the residents of Williams Street, who were outside of the historic district and were bearing the brunt of the lack of adequate parking for the Funeral Home. Finally, she suggested that one of the concerns voiced by the planning staff -- that the expansion would require combining the lots at 300 and 304 West Montgomery Avenue, which would result in a large lot that might never revert to a residential use -- could be alleviated if the Mayor and Council would permit the parking expansion to be on the adjoining parcel without the lots having to be combined.

William Doggett, an architect hired by Pumphrey to design the parking lot, spoke next. He stated that the expanded parking lot would be constructed from a pervious material, that it would be "fully screened" with landscaping, including trees blocking its view from West Montgomery Avenue, and that it would be lit with three foot high bollards that "cast a shallow pool of light." He displayed renderings of the proposed parking lot. He was asked several questions about the design, including whether he had considered the impact of car headlights on the property owners at 306 West Montgomery Avenue. He replied that there is an existing seven-foot high wall at the property line between 304 West Montgomery Avenue and 306 West Montgomery Avenue.

Pumphrey spoke briefly as well. He advised the Mayor and Council that he intended to do whatever was necessary to mitigate any negative impacts on neighbors caused by the

8

planned parking lot expansion. He emphasized the great need for more parking and that the proposed text amendment was designed to affect only his properties.

Four neighboring property owners, including Meg and Phil Bowen, the owners of adjacent property at 306 West Montgomery Avenue, spoke in opposition to the text amendment. Another four neighboring property owners, three of whom live on Williams Street and one who lives in the house directly across the street from 304 West Montgomery Avenue, spoke in support of the text amendment. The president of the West End Community Association gave a statement explaining that because community opinion on the proposal was so mixed, the association had decided not to take a position on the text amendment. A spokesperson for the HDC spoke and explained its reasons for opposing the text amendment.

At the conclusion of the public hearing, the Mayor and Council decided to keep the record open for two more weeks before deliberating on the proposed text amendment.

The Mayor and Council reconvened for public deliberations on November 15, 2010. Those supporting the amendment took the position that the safety of pedestrians and residents of the neighboring properties on Williams Street would be improved by moving the parking off-street. They also emphasized that the Funeral Home is an historic use in the neighborhood. The opposing members expressed concern about approving an expansion of any nonconforming use and that the expansion here would result in a parking lot on a vacant lot, making it less likely that the lot would revert to a residential use at some point in the future. Ultimately, the Mayor and Council voted three to two to support the amendment.

9

The Mayor and one council member opposed and the remaining three council members voted in favor of the amendment.

On December 13, 2010, the Mayor and Council reconvened and adopted Ordinance 22-10, which we quote in pertinent part:

> WHEREAS, William A. Pumphrey . . . filed [the 2010 Application] for the purpose of amending [the Ordinance] to allow the expansion of parking in connection with a nonconforming use in a single dwelling unit residential zone; and;
>
> WHEREAS, the Planning Commission reviewed the proposed text amendment . . . and recommended denial of the application as set forth in a memorandum to the Mayor and Council . . .; and
>
> WHEREAS, pursuant to Article 66B of the Annotated Code of Maryland, the Mayor and Council . . . gave notice that a hearing on said application would be held . . .; and
>
> WHEREAS, on October 25, 2010, said application came on for hearing . . .; and
>
> WHEREAS, the Mayor and Council having considered the text amendment application and the entire file pertaining thereto, said Mayor and Council having decided that the granting of this application, as amended, in the form set forth below, would promote the health, safety and welfare of the citizens of the City of Rockville.
>
> NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND COUNCIL OF ROCKVILLE, MARYLAND, that Text Amendment Application No. TXT2010-00228, be, and the same is hereby, granted, as amended, by amending Article 8, "Transitional Provisions, Nonconformities, Nonconforming Alteration Approval," by adding a new subsection d. to Section 25.08.05 of Chapter 25, "Zoning" as follows:
>
> 25.08.05 – Nonconforming Uses
>
> * * *
>
> d. Additional off-street parking. Where a nonconforming use has been in continual existence in the R-90 Zone within the City since prior to August 3, 1932, off-street parking for the nonconforming use may be altered, expanded or enlarged in

10

> accordance with the requirements of Article 16 and the
> Landscaping, Screening and Lighting Manual.

("2010 Text Amendment")

### B. *Aftermath of the 2010 Text Amendment*

After the application was granted, Pumphrey began the process to combine the two lots and to seek approval for a nonconforming alteration, *i.e.*, to expand the parking lot. Combining the two lots was a prerequisite to expanding the parking lot because the Ordinance requires a parking accessory to a lawful use to be on the same lot as the use being served. *See* RCC § 25.16.04.a (requiring "[a]ll off-street parking . . . required by [the parking regulations of the Ordinance] for any use. . . be located on and entirely within the same record lot with that use, unless otherwise provided in this chapter."). By November 2011, Pumphrey had filed with the planning division a pre-application and had completed the pre-application meeting.

While the pre-application process was ongoing, however, the City's municipal elections were held, on November 8, 2011. Two council members who had voted in favor of the 2010 Text Amendment were defeated, one by a new council member who had campaigned on his opposition to that text amendment. The result was a shift from a three to two majority in favor of the 2010 Text Amendment to three to two majority opposed to it.

On November 16, 2011, Pumphrey filed with the Planning Department a site plan application. It was bifurcated into a request for a nonconforming alteration, assigned case number VAR2012-00030, and a request for a new record plat, assigned case number

PLT2012-00514. It was set in for review by the Development Review Committee ("DRC") on December 15, 2011.

Meanwhile, at the first meeting of the newly elected Mayor and Council on November 28, 2011, the issue of the 2010 Text Amendment was raised and City staff were directed to draft a memorandum about the procedures that were followed in adopting that text amendment and the status of Pumphrey's site plan application.

## C. The 2012 Text Amendment

In its memorandum, the City staff concluded that there had been "no serious procedural or legal errors" in the process by which the 2010 Text Amendment was adopted. On January 9, 2012, the Mayor and Council convened at a public hearing to discuss the memorandum. At that time, Pumphrey's site plan application remained under DRC review and had not been set in for a hearing before the Planning Commission. After lengthy deliberations, the Mayor and Council voted three to two to direct planning staff to file a new text amendment to delete the language inserted in the Ordinance by the 2010 Text Amendment. Those opposed to revisiting the issue took the position that, absent some legal or procedural error in the process that had been employed to adopt the 2010 Text Amendment, the Mayor and Council could not or should not undo the prior amendment.

On January 12, 2012, the Mayor and Council filed an application for text amendment for the stated purpose of "deleti[ng] [the] provision allowing expansion of off-street parking" at the Funeral Home ("the 2012 Application").

12

The Planning Commission reviewed the proposed text amendment and voted four to one to recommend approval

> because the regulation of non-conforming uses intends for such uses to ultimately cease to exist, so that only permitted uses in the current zone can be approved in the future. Allowing the expansion has the practical effect of perpetuating the non-conforming use into the foreseeable future. As noted in the Planning Commission Staff Report, the funeral home can continue to operate as a non-conforming use as it has been for the past 80 years.

On March 26, 2012, the Mayor and Council held a public hearing on the proposed text amendment. It heard a presentation from the Zoning Administrator, who advised that the effect of the adoption of the text amendment would be to prevent the Funeral Home from expanding its parking lot. The Zoning Administrator noted that Pumphrey's request for alteration of the nonconforming use had not yet been heard or approved by the Planning Commission.

The Mayor and Council then heard testimony from more than 40 people in attendance. Twenty-one community members spoke in opposition to the newly proposed text amendment and twelve spoke in support. Pumphrey and his attorney each addressed the Mayor and Council, as did counsel for the Bowens. At the conclusion of the hearing, the Mayor and Council decided to keep the record open until April 2, 2012.

On April 16, 2012, the Mayor and Council reconvened at a public hearing to deliberate. They voted three to two to adopt the text amendment deleting Section 25.08.05.d (the 2010 Text Amendment).

13

On May 7, 2012, the Mayor and Council adopted Ordinance 06-12, which we quote

in pertinent part:

> WHEREAS, the Mayor and Council of Rockville . . . filed Text Amendment Application TXT 2012-233 for the purpose of amending Chapter 25 of the [RCC] so as to delete Section 25.08.05.d; and
> WHEREAS, the Planning Commission reviewed the proposed text amendment . . . and recommended that the text amendment be approved; and
> WHEREAS, pursuant to Article 66B of the Annotated Code of Maryland, the Mayor and Council gave notice that a hearing on said application would be held . . . ; and . . .
> WHEREAS, on March 26, 2012, said application came on for hearing . . .; and
> WHEREAS, the Mayor and Council having considered the text amendment application and the entire file pertaining thereto, said Mayor and Council having decided that the granting of this application, in the form set forth below, would promote the health, safety and welfare of the citizens of the City of Rockville.
> NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND COUNCIL OF ROCKVILLE, MARYLAND, that Text Amendment Application No. TXT2012-00233, be, and the same is hereby granted, by amending Article 8, "Transitional Provisions, Nonconformities, Nonconforming Alteration Approval" so as to delete Section 25.08.05.d.

("2012 Text Amendment")

On June 6, 2012, in the Circuit Court for Montgomery County, Pumphrey filed a

petition for judicial review and for a writ of administrative mandamus, under Rule 7-401 *et*

*seq*.

### D. The Final Record Plat Application

Although the enactment of the 2012 Text Amendment prevented Pumphrey from

going forward with his request to alter a nonconforming use to expand the parking lot, it did

14

not prevent the completion of his request to consolidate 300 West Montgomery Avenue and 304 West Montgomery Avenue into one record lot.

On May 16, 2012, planning staff recommended approval of Pumphrey's proposed record plat. Staff noted that Pumphrey sought "the resubdivision of two parcels into a single record lot made up of 46,965 square feet of land." The resulting combined lot would be composed of 44,862 square feet, with 2,103 square feet dedicated to public use.

The staff report explained that the granting of the record plat application would not permit "any right to further development of the property" because the nonconforming Funeral Home use could not be "enlarged or expanded." With respect to the plat application's compliance with the Ordinance, the staff report stated that lots in an R-90 Zone "must contain a minimum of 9,000 square feet of land and be a minimum of 80 feet wide." The Ordinance further provides that "[i]n any resubdivision of developed or undeveloped lots within an existing residential area, the plat must maintain, to the extent feasible, the average area and frontage of existing lots within 500 feet of the proposed resubdivision." The staff report concluded that, if the plat application were approved, the resulting lot "would clearly be the largest single lot in the area at 44,862 square feet of land with 220 feet of frontage along West Montgomery Avenue and approximately 209 feet of frontage along Williams Street." Although a nearby church appeared to be larger, it actually was comprised of two deeded lots, the larger of which was just 31,176 square feet.

The staff concluded, nevertheless, that the plat maintained "to the extent feasible, the average area and frontage of existing lots within 500 feet of the proposed resubdivision."

15

This was so because the purpose of the lot size regulation was to prevent subdivision that would create "unusual or different lots associated with the existing and surrounding neighborhood." Because the Funeral Home and the adjoining parcel had been in common ownership for more than 50 years and "visually, the overall property ha[d] appeared to be a single property since the house on the western lot was demolished in 1970," the resubdivision of the lots would not alter the character of the neighborhood. Moreover, were strict compliance with the lot size regulation required, Pumphrey's lots actually would have to be subdivided into smaller lots. For these reasons, the staff found in its report that the final record plat met the feasibility prong of the Ordinance and should be approved.

On May 23, 2012, the Planning Commission held a public hearing to consider the plat application. It heard from counsel for Pumphrey and one community member, who opposed the plat application. At the conclusion of the hearing, the Planning Commission voted four to two to deny the plat application. Those members voting against the plat application opined that approving the application would produce a lot much bigger than the average lot in the neighborhood. Members also expressed concern that combining the lots would make it less likely that the property ever would return to a residential use.

By letter dated June 6, 2012, the Chief of Planning informed Pumphrey in writing that the plat application was denied because it would have resulted in a lot that "far exceeded" the average area of existing lots within 500 feet and because the proposed lot "was not in keeping with the Master Plan, which recommends maintaining the residential character of the area." Approval of a combined lot would have "move[d] it further from becoming a

16

residential lot in the R-90 Zone, particularly with the existing nonconforming use on the property."

On June 27, 2012, in the Circuit Court for Montgomery County, Pumphrey petitioned for judicial review of the Planning Commission's decision.

### E. Proceedings in the Circuit Court

On August 6, 2012, the City moved to dismiss the petition for judicial review and for administrative mandamus review in the text amendment case. It asserted that the Mayor and Council's enactment of the 2012 Text Amendment was a legislative act not subject to judicial or administrative mandamus review.

On September 7, 2012, Pumphrey moved to consolidate the judicial review action in the text amendment case and the judicial review action in the plat case. The City and the Planning Commission opposed consolidation. By order dated October 25, 2012, the circuit court granted the motion to consolidate.

On January 17, 2013, the circuit court heard argument on the City's motion to dismiss and on the petitions for judicial review. It held both matters *sub curia*.

On April 29, 2013, the circuit court entered a memorandum opinion and order denying the City's motion to dismiss the petition for judicial and administrative mandamus review in the text amendment case; ruling that the Mayor and Council's approval of the 2010 Text Amendment and its approval of the 2012 Text Amendment were quasi-judicial acts subject to judicial review; ruling that the 2012 Text Amendment was enacted arbitrarily and capriciously and was invalid; and ruling that the Planning Commission's denial of the plat

17

application was not supported by substantial evidence and also was arbitrary and capricious.

This timely appeal followed.

## DISCUSSION

### I.

### Denial of the City's Motion to Dismiss in the Text Amendment Case

The City contends the "only issue" in the text amendment case is whether the circuit court erred by denying the motion to dismiss; and that is an issue of law that we review *de novo*. It asserts that the Mayor and Council were acting in a purely legislative capacity when they enacted Ordinance 06-12, which had the effect of granting the 2012 Text Amendment and reversing the effect of Ordinance 22-10, which had granted the 2010 Text Amendment. The City maintains that the Mayor and Council were legislating, not adjudicating; therefore, enactment of the text amendment was not a "zoning action," as that term is used in art. 66B, section 4.08(a), and was not subject to judicial review.[3] It further asserts that the propriety of the 2012 Text Amendment is not an issue appropriate for administrative mandamus relief because such an action only may challenge "a quasi-judicial order or action of an administrative agency." Md. Rule 7-401(a).

Pumphrey responds that, under the authority of *Maryland Overpak Corp. v. Mayor & City Council of Baltimore*, 395 Md. 16 (2006), the Mayor and Council was acting in a

---

[3]Section 4.08(a) now appears at LU section 4-401 with some stylistic alterations. We use the language as it appeared in former section 4.08(a), as this was the governing statute when the instant case was decided.

quasi-judicial capacity when it considered the 2010 Text Amendment, which was initiated by him and would affect only his property, because it based its decision to adopt the amendment on the unique characteristics of the properties at 300 and 304 West Montgomery Avenue, not on broad-based policy justifications. The same was true of the Mayor and Council's subsequent act in adopting the 2012 Text Amendment that deleted the language authorizing Pumphrey to expand its parking lot. Pumphrey asserts that given that both text amendments were enacted by the Mayor and Council in its adjudicatory capacity, the 2012 Text Amendment is subject to statutory judicial review as a "zoning action" or to mandamus review pursuant to Rule 7-401. He further asserts that, under the "change of mind" doctrine, the Mayor and Council's adoption of the 2012 Text Amendment plainly was arbitrary and capricious.[4]

We review the circuit court's denial of the City's motion to dismiss *de novo*. *See Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72 (2004) ("When the trial court's order 'involves an interpretation and application of Maryland statutory and case law, [Maryland appellate courts] must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.'" (quoting *Walter v. Gunter*, 367 Md. 386, 392 (2002)). The circuit court denied the motion because it concluded that enactment of the 2010 Text

___

[4]Under the "change of mind" doctrine, a mere change of mind is an insufficient basis upon which to reverse a prior zoning adjudication. The adjudicating body must identify changed facts affecting the merits of the prior decision. *See, e.g., Woodlawn Area Citizens Ass'n, Inc. v. Bd. of Cnty. Comm'rs of Prince George's County*, 241 Md. 187 (1965); *Seminary Galleria, LLC v. Dulaney Valley Improvement Ass'n, Inc.*, 192 Md. App. 719 (2010).

Amendment and the 2012 Text Amendment were quasi-judicial acts subject to judicial review pursuant to Section 4.08(a) of art. 66B or under the rules governing administrative mandamus review. We begin by setting out those provisions.

For non-charter counties and certain municipal corporations, including the City, section 4.08(a) of art. 66B creates the right to challenge, in the circuit court, certain zoning and land use decisions. It provides:

> (a) *Who may appeal; procedure*. -- (1) Any of the following persons may, jointly or severally, appeal a decision of a board of appeals or ***a zoning action of a local legislative body*** to the circuit court of the county:
> > (i) A person aggrieved by the decision or action;
> > (ii) Any taxpayer; or
> > (iii) Any officer, department, board, or bureau of
> > the local jurisdiction.
> (2) The appeal shall be taken in accordance with Title 7, Chapter 200 of the Maryland Rules.
> (3) This subsection does not change the existing standards for review of a zoning action.

(Emphasis added.) Rule 7-401 provides that an "action[] for judicial review *of a quasi-judicial order or action of an administrative agency"* may be pursued as an action for writ of administrative mandamus. Md. Rule 7-401(a) (emphasis added).

The question of what constitutes a "zoning action" under section 4.08(a) and its counterpart at section 2.09(a)(1)(ii), which governs Baltimore City, has generated numerous appellate opinions by this Court and the Court of Appeals. As we shall explain, these decisions make plain that the 2012 Text Amendment at issue in the instant appeal is not a zoning action subject to statutory judicial review and, for the same reasons, also is not subject to administrative mandamus review.

20

Before 2006, "the prevailing rule  was that *only* zoning reclassifications constituted "zoning actions" [as that term is used in Art. 66B.]." *Md. Overpak Corp.*, 395 Md. at 32; *see, e.g., Bd. Of County Comm'rs of Carroll County v. Stephans*, 286 Md. 384 (1979) (zoning reclassification is a "zoning action").  In *MBC Realty, LLC v. Mayor and City Council of Baltimore*, 160 Md. App. 376, 387 (2004), *vacated on other grounds*, 403 Md. 216 (2008), this Court summarized the state of the law as follows:

> We know from [*Stephans*, 286 Md. at 384,] that when a legislative body comprehensively zones, comprehensively rezones, or ***adopts a text amendment to a zoning ordinance***, it is not "zoning action."  We also know that when a legislative body changes the zoning classification of a particular property, it is "zoning action" subject to administrative appeal.

(Emphasis added.)

Since this Court decided *MBC Realty*, we and the Court of Appeals have clarified that a local legislative body may engage in "zoning action" beyond the realm of zoning classification (or reclassification) of a particular property.  Two cases inform our analysis. First, in *Maryland Overpak, supra*, the Court of Appeals considered whether the Baltimore City Council had engaged in a "zoning action" subject to judicial review when it adopted an ordinance amending an approved 67 1/2 acre planned unit development ("PUD") in an area of Canton in Baltimore City that was zoned for heavy industry.  The amendment to the PUD increased the number of permitted residential dwelling units and modified "the uses and buildings permitted and their locations and size."  395 Md. at 24 (internal quotation marks omitted).

21

A neighboring property owner, Maryland Overpak, sought judicial review of the City Council's enactment of an ordinance so amending the PUD. Maryland Overpak asserted that it was "aggrieved" by the City Council's action because, as amended, the PUD would interfere with its interest in using a roadway as a staging area for its business. The City Council moved to dismiss the petition for judicial review, arguing that the circuit court lacked jurisdiction over the case because it did not involve a "zoning action." The circuit court agreed, reasoning that because the amendment of the PUD did "not amount to a reclassification of the zoning district of the subject property," it was not a "zoning action." *Id*. at 26. Maryland Overpak appealed.

The Court of Appeals granted a *writ of certiorari* before this Court considered the appeal. It explained that the Baltimore City Council is authorized by the Baltimore City Zoning Code ("BCZC") to approve initial applications for PUDs and to approve amendments to PUDs. The BCZC requires that applications for a PUD or for an amendment to an already approved PUD be accompanied by a "detailed development plan" including, among other things, a map with accurate boundary lines; architectural drawings of all proposed buildings and structures; the location of existing and proposed sewer and water facilities; and a detailed time line for the start and completion of the development. *Id*. at 27-28. After a PUD application or amendment application has been submitted, it must be reviewed by numerous City agencies, all of which "apply a multitude of governing standards that essentially ensure that the proposed PUD will conform with the surrounding area in terms of contemplated development; topography; value of surrounding areas; availability of light, air, open space,

22

and street access; and risks of public and health hazards." *Id*. at 28. After receiving the development plan, the reports and recommendations of the reviewing agencies, and holding a hearing, the City Council may approve a PUD by passing an ordinance. Once approved, a "PUD designation . . . for a specific parcel or assemblage of properties[] is placed on top of the underlying zone or zones." *Id*. Thus, a PUD designation differs from a true zoning reclassification of property or properties.

The Court held that the City Council's action in approving the amendment to the PUD amounted to a "zoning action" and, therefore, was subject to judicial review. It began by analyzing this Court's decision in *Armstrong v. Mayor and City Council of Baltimore*, 169 Md. App. 655 (2006) ("*Armstrong III*"). There, we considered whether approval of a conditional use by the Baltimore City Council was a "zoning action." In answering that question in the affirmative, we drew a distinction between "legislative and quasi-legislative" acts by the City Council, on the one hand, and "quasi-judicial" or administrative acts, on the other. 169 Md. App. at 669. We held that "the grant of a conditional use applicable to a specific property is administrative" and is subject to judicial review. *Id*. at 677.

The *Maryland Overpak* Court summed up this Court's holding in *Armstrong III* as follows: "a piecemeal application, initiated by the property owner for a specific conditional use for a specific property, is a 'zoning action,' while zoning text amendments or comprehensive rezonings initiated by government are not." 395 Md. at 35. The Court explained the criteria to be applied in assessing whether a legislative body is engaging in a "quasi-judicial inquiry": "the essential questions to be asked are: what property or properties

23

are being examined, for what reason, and at whose behest." *Id*. at 37. "[P]roceedings or acts that scrutinize individual parcels or assemblages for the consideration of property-specific proposed uses, at the owner's or developer's initiative[] ordinarily suggest a quasi-judicial process or act." *Id*. The Court emphasized, however, that designating an act as "quasi-judicial" does not "obviat[e] the need to further inquire into whether the act in question is eligible for statutory judicial review." *Id*. at 36-37.

The Court determined that the procedure followed by the Baltimore City Council in deciding requests for amendment of a PUD was "of sufficient quasi-judicial character, rather than legislative in nature" so as to require the Court to decide whether it was a "zoning action" subject to statutory judicial review. *Id*. at 44. In reaching this determination, the Court emphasized that under State law and the BCZC, the City Council must hold a hearing and make certain findings of fact before it can approve a PUD or an amendment to a PUD.[5] Moreover, the hearing notes from the Council's public hearing evidenced that the "focus of the hearing was on the potential problems of increased noise, traffic, encroachment into the industrial district, and obstruction of water views from a nearby park." 395 Md. at 43. In

_____

[5]Under State law, the City Council must make findings of fact pertaining to "population changes, availability of public facilities, present and future transportation patterns, compatibility with existing and proposed development for the area, the recommendations of the Planning Commission and the Board of Municipal and Zoning Appeals, and the relation of the act to the City's plan." 395 Md. at 41-42. The BCZC further required the Council to apply the same standards to a PUD proposal applicable to an application for a conditional use and to consider ten additional criteria "respecting the physical features of the land, health and safety of residents, as well as use and bulk regulations." *Id*. at 42.

addition to the public hearing, the Council separately considered and approved the development plan associated with the amendment to the PUD, subject to thirteen additional required considerations, which amounted to a "detailed and thorough examination of the unique circumstances of a specific PUD proposal for a specific parcel." *Id.* at 43-44.

The Court held that the term "zoning action" as used in sections 2.09 and 4.08(a) of art. 66B means:

> any act by the Mayor and City Council that (1) decides the use of a specific parcel or assemblage of parcels of land, (2) was initiated by an individual application by a property owner or its representative, (3) was based on fact-finding (from a record containing evidence, usually both pro and *con*) adduced through governmental agency analysis of the proposal and through a public hearing, and (4) either creates or modifies substantively the governing zoning classification or defines the permissible uses, building and lot sizes, population density, topographical and physical features, and other characteristics of a specific parcel or assemblage of parcels of land by exercising some discretionary judgment after the consideration of the unique circumstances of the affected parcels and buildings.

*Id*. at 50 (emphasis in original) (footnote omitted). The Court stated, that this "framework" explains "why amendments to the text of zoning regulations, comprehensive zonings, and other acts that are legislative in nature do not qualify for judicial review under [sections 2.09 and 4.08(a)]." *Id*. Applying this framework to the City Council's decision to approve the amendment to the PUD, the Court further held that because the ordinance in question "was enacted as the result of a quasi-judicial process"; because its "prevailing purpose" was "to define the permissible uses . . . of the specific parcel"; and because the City Council approved the amendment after holding a hearing, receiving evidence, and making required statutory findings, the action was a "zoning action" subject to judicial review. *Id*. at 53.

Four years later, the Court of Appeals decided *Talbot County v. Miles Point Property, LLC*, 415 Md. 372 (2010). That case involved consolidated appeals, both challenging actions by the Talbot County Council to deny a property owner's application to amend the sewer classifications for the subject property from S-2 ("contemplated for improvements, extensions, or construction of shared sanitary facilities within three to five years") to S-1 ("'immediate priority status' for the purposes of extending shared sanitary facilities"). 415 Md. at 378.

In the first appeal, the property owner challenged the denial before the local board of appeals, which dismissed the appeal for lack of jurisdiction on several bases including, as relevant here, that the County Council's order was not an "'executive, administrative, or adjudicatory'" order." *Id*. at 380. The property owner sought judicial review of the board's decision in the circuit court. The circuit court reversed the board and remanded for further proceedings. Talbot County appealed from that judgment.

In the second appeal, the property owner challenged the County Council's denial of its application by filing an administrative mandamus action in the circuit court. The circuit court dismissed the action, ruling that the property owner had to first pursue administrative relief before the board of appeals. Talbot County appealed from that judgment as well. The Court of Appeals granted a *writ of certiorari* in each case before consideration by this Court, and consolidated the appeals.

In deciding whether the local board of appeals had jurisdiction to review the County Council's action or whether the circuit court had jurisdiction to grant mandamus relief, the

26

Court concluded that the key inquiry was whether the County Council was acting in a legislative or quasi-judicial capacity when it considered and denied the applications to amend the sewer classifications for the two properties.[6]  It opined:

> In determining whether the Council's action was adjudicatory or legislative in nature, we are informed by our analysis of zoning decisions in *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530 (1999). In *Bucktail*, we held:
>
>> The determination of whether a local zoning authority is acting in an adjudicative or legislative manner is dependent upon the nature of the particular act in which it is engaged. This determination is not based on whether the zoning decision adversely affects an individual piece of property but whether the decision itself is made on individual or general grounds.
>
> *Id*. at 545 (quotation marks and citation omitted). It is thus not a hearing's "mere focus on one parcel that is dispositive of [the hearing's] quasi-judicial nature, but rather that the matter taken up at the hearing is disposed of based on the unique characteristics" of the property at issue.  *Md. Overpak Corp. v. Mayor & City Council of Balt.*, 395 Md. 16, 39 (2006).  In other words, the greater a decision[-]maker's reliance on general, "legislative facts," the more likely it is that an action is legislative in nature. Likewise, the greater a decision-maker's reliance on property-specific, "adjudicative facts," the more reasonable it is to term the action adjudicatory in nature.

---

[6]Talbot County is a charter county.  The jurisdiction of its board of appeals is thus governed by the Express Powers Act, then codified at Md. Code (1957, 2005 Repl. Vol.), Article 25A, Section 5.  As relevant here, Section 5(U) of the Express Powers Act grants a local board of appeals in a charter county the power to hear appeals from "any adjudicatory order" issued by the county council.

Similarly, the Court noted that Rule 7-401, governing administrative mandamus actions in the circuit court, requires that the "underlying action being reviewed must be quasi-judicial in nature, where quasi-judicial action is synonymous with administrative adjudication."  415 Md. at 394.

*Id*. at 387 (internal parallel citations omitted). "Generally, adjudicative facts concern questions of 'who did what, where, when, how, why, [and] with what motive or intent,' while legislative facts 'do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.'" *Id.* at 387-88 (quoting *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 711-12 (1977), in turn quoting, 1 Kenneth C. Davis, *Administrative Law Treatise* § 7:02 (1958)).

The *Miles Point* Court explained that the "proper classification of the Council's hearings in [the consolidated appeals was] quite straightforward." *Id*. at 387. In the first case, although the application to amend the sewer classification of the subject property was initiated by the property owner and the County Council identified the property owner and the specifics of the application in its findings of fact, "[t]he balance of the Council's findings address[ed] broad-based facts relating to Talbot County infrastructure, the capacity and history of the Region II Wastewater Treatment Plan, and policy issues." 415 Md. at 388.[7] In denying the reclassification application, the Council "chose not to focus on the merits and flaws of reclassifying [the] specific property, but rather on how that reclassification would fit into Talbot County's overall policy on wastewater treatment." *Id*. at 391. Thus, even though the Council's "ultimate decision [in that case] specifically affected" one property, that did not "transform" what was a legislative action into an adjudicatory one. *Id*.

---

[7]The County Council, in denying the proposal, issued written findings of fact specifying in some detail the nature of the proposed development to be served by shared sanitary facilities, the specific sewer upgrades requested by the proposal, and the timeline for completion of the development.

In the second case, the County Council similarly "based its decision largely on legislative facts." *Id.* at 395. The County Council found that adequate capacity existed to serve the proposed development on the property; nevertheless, it concluded that reclassification "would be inconsistent with the State Smart Growth Law" and might affect funding agreements between the Town of Easton and the State. *Id.* (internal quotation marks omitted). The County Council also concluded that reclassification would "run afoul" of certain strategic goals identified in the County's comprehensive water and sewer plan. *Id.* Thus, the County Council did not focus on the unique characteristics of the property in denying the reclassification request. Given its conclusion that the County Council's action in each case was legislative and not quasi-judicial, the Court held that neither the board of appeals nor the circuit court had jurisdiction to hear a challenge of the denial of the reclassification requests. 415 Md. at 398.

We return to the case at bar. At the outset, we must clarify what is before us in the instant appeal. The City urges that the "only issue" we must decide is whether the 2012 Text Amendment was a "zoning action" or otherwise was a "quasi-judicial order or action." If the answer to that question is "no," the result must be that the text amendment case should have been dismissed by the court because it was not subject to review as an administrative appeal. Pumphrey responds that the legislative or quasi-judicial nature of the 2010 Text Amendment is squarely before this Court because, if the action in enacting that text amendment was quasi-judicial, then the latter action deleting it necessarily was quasi-judicial as well, as it amounted to a reversal of a prior zoning action.

We agree with the City that it is the 2012 Text Amendment, not the 2010 Text Amendment, that we must assess. Pumphrey filed his petition for judicial and/or administrative mandamus review within 30 days of the Mayor and Council's enactment of Ordinance 06-12, adopting the 2012 Text Amendment. It is the only action by the Mayor and Council that properly was before the circuit court on judicial review. Because, for the reasons to follow, we conclude that enactment of the 2012 Text Amendment was not a quasi-judicial act, it was not a "zoning action" subject to statutory judicial review under art. 66B, section 4.08(a) and it was not appropriate for mandamus review. It follows that Pumphrey's action for judicial review in the text amendment case should have been dismissed.

Our starting point in analyzing the 2012 Text Amendment is the *Overpak* test. The first prong of that test is that the action by the local legislative body must "decide[] the use of a specific parcel or assemblage of parcels of land." 395 Md. at 50. In *Overpak*, that prong plainly was satisfied because the Baltimore City Council decided the use of the subject property by overlaying a PUD on the existing Euclidian zoning map. Similarly, in *Miles Point*, the County Council was asked to amend the sewer classification of particular properties, which would have resulted in the properties' receiving "'immediate priority status' for the purposes of extending shared sanitary facilities to service development of the property." 415 Md. at 378.

In the instant case, in contrast, the Mayor and Council did not decide the use of Pumphrey's property when it enacted the 2012 Text Amendment deleting the language added by the 2010 Text Amendment that had created a means for certain property owners to seek

30

approval of the expansion of parking accessory to a nonconforming use. The 2012 Text Amendment did not change the zoning for the Funeral Home property, which at all times remained R-90 HD. It did not alter the site plan for the Funeral Home. It did not grant a variance or a special exception. It did not affect the lawfulness of the nonconforming use in existence at 300 West Montgomery Avenue. The 2012 Text Amendment deleted language from the Ordinance that had provided a means of expanding nonconforming uses.

Although, as explained, the 2010 Text Amendment is not directly at issue, we note that that amendment also did not decide the use of Pumphrey's property. It created a vehicle by which Pumphrey and any other similarly situated property owner could pursue expansion of parking facilities. The 2010 Text Amendment did not mention the Funeral Home by name or address. The effect of the 2010 Text Amendment was to allow property owners to pursue before the Planning Commission an application for alteration of nonconforming use for an expansion of parking accessory to that use. Any expansion only could be authorized by the Planning Commission, not by the Mayor and Council, and only after appropriate review. *See* RCC § 25.08.08 (setting out the nonconforming alteration approval process).

The second prong of the *Overpak* test also is not satisfied. The 2012 Text Amendment was initiated by the Mayor and Council, not "by an individual application by a property owner or its representative." 395 Md. at 50.

The third and fourth *Overpak* prongs require that the decision in question be based "on fact-finding (from a record containing evidence, usually both pro and *con*) adduced through governmental agency analysis of the proposal and through a public hearing" and that it

31

create[] or modif[y] substantively the governing zoning classification or define[] the permissible uses, building and lot sizes, population density, topographical and physical features, and other characteristics of a specific parcel or assemblage of parcels of land *by exercising some discretionary judgment after the consideration of the unique circumstances of the affected parcels and buildings.*

*Id*. (emphasis added) (footnote omitted). In *Overpak*, the City Council was required by statute to make very specific findings of fact, which were reflected in its decision granting the PUD, regarding "population changes, availability of public facilities, present and future transportation patterns, compatibility with existing and proposed development for the area, the recommendations of the Planning Commission and the Board of Municipal and Zoning Appeals, and the relation of the act to the City's plan." *Id*. at 41-42. In *Miles Point*, the County Council also made detailed findings of fact, although the Court ultimately determined that those findings were legislative, not adjudicative, because they were not "rooted in the unique characteristics of the [property at issue] or the associated development proposal." 415 Md. at 391.

Here, the Mayor and Council did not make *any* factual findings before granting the 2012 Text Amendment (or the 2010 Text Amendment). While individual council members made statements on the record reflecting their views about the 2012 Text Amendment and the reasons they were voting for or against it, these did not amount to factual findings. Nowhere in the record of the 2012 Text Amendment proceedings (or the 2010 Text Amendment proceedings, for that matter) does the three-person majority favoring the amendment set out any findings of fact pertaining to the Funeral Home use, the proposed

32

parking lot, the impact on neighboring properties, or the impact on the character of the neighborhood as a whole. Ordinance 06-12 also does not include any findings, except the generalized statement that the "granting of this application . . . . would promote the health, safety and welfare of the citizens of the City of Rockville." This statement also appeared in Ordinance 22-10, granting the 2010 Text Amendment.

As in *Miles Point*, the Mayor and Council's deliberations largely concerned the policy favoring cessation of nonconforming uses, which underlies the restrictions on expansion of nonconforming uses in the Ordinance. This policy was not served by amending the Ordinance to allow expansion for certain properties, even for historic properties that were well-regarded by neighbors. These were quintessentially legislative facts.[8]

The "governmental agency analysis of the proposal" by the Planning Commission further demonstrates that the adoption of the 2012 Text Amendment was a legislative, not a quasi-judicial, act. The Planning Commission Staff Report, which was in the record before the Mayor and Council, described the history of the 2010 Text Amendment and recommended approval of the 2012 Text Amendment for the following reason:

> The intent behind the regulation of nonconforming uses is for them to ultimately cease to exist, with only uses allowed in the current zone to be approved in the future. Allowing the expansion of the parking lot for the funeral home will have the practical effect of perpetuating the nonconforming

---

[8]Even those opposed to the 2012 Text Amendment emphasized legislative facts. For example, a council member who had voted in favor of the 2010 Text Amendment and voted against the 2012 Text Amendment explained that it had been a "close decision" for him and that he appreciated the chance to "take a public policy issue to a higher level" by "weigh[ing] . . . the historic district interest versus [the] public safety interest."

33

use for the foreseeable future, contrary to the intent of the code. The staff therefore recommends that the text amendment to delete this exception language be approved.

As noted, the Planning Commission, in reliance upon the staff recommendation, voted four to one to recommend approval of the 2012 Text Amendment. (This was consistent with the Planning Commission's previous vote to recommend against the adoption of the 2010 Text Amendment.) Thus, the agency analysis focused on the broad-based policy implications of creating any exception to the regulations limiting the expansion of nonconforming uses. It did not focus on why this particular nonconforming use was not amenable to expansion or the particular proposal for expansion. *See Miles Point*, 415 Md. at 391 (noting that the County Council did not focus on unique facts that made "reclassification untenable" for the particular properties).

Finally, the legislative acts of the Mayor and Council did not become adjudicative acts merely because the 2010 Text Amendment was drafted in such a way as to affect only Pumphrey's properties and the 2012 Text Amendment, by deleting the language previously added, negatively affected only his properties. In *Miles Point*, the applications to amend the sewer classifications were property specific and the denial of those applications negatively affected only those properties. Nevertheless, the Court of Appeals held that because the County Council denied the requested reclassifications for broad, policy-based reasons and not because it found that the particular property was not amenable to reclassification, the acts were legislative.

For all these reasons, the circuit court lacked jurisdiction pursuant to art. 66B, section 4.08(a) to undertake judicial review of the enactment of the 2012 Text Amendment, because the enactment was not a zoning action. The circuit court also lacked jurisdiction to undertake administrative mandamus review in the text amendment case because the enactment was not a "quasi-judicial act." Accordingly, the circuit court erred by denying the City's motion to dismiss on these grounds.[9]

## II.

### Reversal of the Planning Commission's Decision in the Plat Case

The Planning Commission contends the circuit court erred by reversing its decision to deny Pumphrey's final record plat. It asserts that the two reasons it gave for its decision – the combined lot did not maintain, to the extent feasible, the average area and frontage of lots within 500 feet and the plat application did not advance the Master Plan's goal of maintaining the residential character of the neighborhood – both were supported by substantial evidence in the record.

Pumphrey responds that the Planning Commission acted arbitrarily and capriciously by denying the record plat application when it "disregard[ed] the analysis and findings of the City's professional planning staff," who recommended approval. He asserts that the Planning Commission committed three errors. First, it adopted an "unprecedented literal

---

[9]We note that, to the extent there was any ground or basis to challenge the legislative action in this case, a declaratory judgment would have been the proper vehicle. *See MBC Realty, LLC v. Mayor and City Council of Baltimore*, 403 Md. at 242; *Anderson House, LLC v. Mayor and City Council of Rockville*, 402 Md. 689, 705 (2008).

interpretation" of section 25.21.22.b of the Ordinance, with the effect of imposing an unintended "maximum lot size requirement."  Second, it relied upon a "vague master plan recommendation[] to justify denial" when conformity with the master plan was not required for the plat to be approved.  Finally, even if master plan nonconformity was an appropriate basis upon which to deny the plat application, the Planning Commission's finding of nonconformity was impermissibly vague and was not supported by substantial evidence in the record.

Our review of a final administrative agency decision, such as that of the Planning Commission, is highly deferential:

> In [an] appeal from the judgment of the circuit court on judicial review of a final agency decision, we look "through" the decision of the circuit court and review the decision of the [agency]. *People's Counsel v. Country Ridge Shopping Ctr., Inc.*, 144 Md. App. 580, 591 (2002).  *See also Ins. Comm'r v. Engelman*, 345 Md. 402, 411 (1997) (reviewing a final decision of the Insurance Commissioner).   Our  review  of  the  agency  decision  is circumscribed. *See Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67 (1999).  It is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine  if  the  administrative  decision  is  premised  upon  an  erroneous conclusion of law." *United Parcel Serv. v. People's Counsel*, 336 Md. 569, 577 (1994).

> In applying these standards, we review the record in the light most favorable to the agency and "defer to [its] fact-finding and drawing of inferences" if supported by any evidence in the record. *Banks, supra*, 354 Md. at 68.  We review purely legal decisions *de novo*.  *See People's Counsel v. Loyola College in Md.*, 406 Md. 54, 67–68 (2008).  Even so, with respect to an agency's legal conclusions, we give "considerable weight" to the agency's "interpretation and application of the statute which the agency administers." *Banks*, at 69.  *See also Marzullo v. Kahl*, 366 Md. 158, 173 (2001) (appellate court must accord appropriate deference to agency expertise even with respect to conclusions of law).  In the context of appellate review of an administrative

36

agency decision on a mixed question of law and fact, we apply the substantial evidence test. *Charles County Dep't of Social Servs. v. Vann*, 382 Md. 286, 296 (2004).

*People's Ins. Counsel Div. v. State Farm Fire and Cas. Ins. Co.*, 214 Md. App. 438, 449–50 (2013), *cert. granted on other grounds*, 436 Md. 501 (2014) (internal parallel citations omitted).

In denying the final record plat, the Planning Commission relied in large part on its conclusion that the proposed plat failed to comply with RCC section 25.21.22.b. That section provides:

> b. *Resubdivision of existing lots.* In any resubdivision of developed or undeveloped lots within an existing residential area, *the plat must maintain, to the extent feasible, the average area and frontage of existing lots within five hundred (500) feet of the proposed resubdivision.* This requirement supercedes the minimum lot size and frontage requirements of the applicable zone, except where the average lot size or frontage of the existing lots is smaller than the minimum requirements of the zone, in which case the minimum requirements of the zone apply.

(Emphasis added.)

The staff report in evidence before the Planning Commission stated that the intent of this regulation is to "maintain the character of the neighborhood by not allowing subdivisions that create[] unusual or different lots associated with the existing and surrounding neighborhood." There is no dispute that the final record plat, if approved, would have resulted in a lot that far exceeded "the average area and frontage of existing lots within five hundred (500) feet." At the hearing before the Planning Commission, a planning staff member presented the proposed final record plat. She explained that it would result in "a

37

large lot for the zone." Lots in the RD-90 zone typically have about 80 feet of frontage. The Pumphrey lots, if combined, would have had 220 feet of frontage.[10] Lots in the RD-90 zone typically are around 9,000 square feet. The Pumphrey lots, if combined, would have been more than 40,000 square feet.

The plain language of RCC 25.21.22.b does not distinguish between lots that fail to comply with the average area and frontage of existing lots within 500 feet because the lot is too small or because the lot is too large. Moreover, we accord deference to an agency's interpretation of the regulations it administers. *See Frey v. Comptroller of the Treasury*, 422 Md. 111, 138 (2011) ("[W]e afford great weight to the agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose."). Here, the Planning Commission decided to deny the final record plat on the basis that it failed to maintain, to the extent feasible, the average area and frontage of existing lots in the neighborhood. This finding was supported by substantial evidence in the record and was not legally erroneous. On this basis alone, we would affirm the final decision of the Planning Commission.

## III. & IV

### Remand to the Planning Commission

[10]The staff member also opined that, in her experience, RCC section 25.21.22.b always had been applied so as to ensure a minimum lot size, not to restrict the creation of larger lots. One of the members of the Planning Commission asked, however, whether the creation of a much larger lot could have the effect of significantly changing the average lot size in the area and, as a result, preventing other property owners wishing to subdivide into smaller lots from doing so. She conceded that this was a possibility.

Our resolution of the first two issues obviates the need to address whether the circuit court should have remanded the plat case to the Planning Commission for further proceedings or whether the circuit court abused its discretion by consolidating the two cases on judicial review.[11]

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED WITH INSTRUCTIONS: 1) TO ENTER AN ORDER DISMISSING THE ACTION FOR JUDICIAL REVIEW OF THE TEXT AMENDMENT CASE; AND 2) TO ENTER AN ORDER AFFIRMING THE DECISION OF THE PLANNING COMMISSION DENYING THE FINAL RECORD PLAT. COSTS TO BE PAID BY THE APPELLEES.**

---

[11]On the latter issue, in any event, we think it plain that consolidation was appropriate because the cases pertained to "a common subject matter." Md. Rule 2-503(a)(1).